[Civ. No. 13355. Third Dist. Apr. 23, 1973.]

GLEN KADELBACH, Plaintiff and Respondent, v.
LLOYD AMARAL, as Executor, etc., et al., Defendants and Appellants.

## COUNSEL

Price, Burness & Price and Robert E. Burness for Defendants and Appellants.

Leonard & Lyde, C. Keith Lyde, Laughlin, Craig & Christensen and Nels A. Christensen for Plaintiff and Respondent.

## OPINION

**GOLDSTEIN, J.***—Defendants Amaral Trucking and Jim Nunn appeal from a judgment in favor of the plaintiff entered on a jury's verdict in a personal injury action. Reversal is sought solely on errors of law alleged to have occurred at the trial.

### THE FACTS

In 1967, Paradise Irrigation District located in Butte County ordered a quantity of mortar-lined steel pipe from Southern Pipe and Casing

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

Company of Milpitas, California.[1] The latter engaged defendant Amaral to deliver the pipe to Paradise. Amaral, in turn, hired Nunn as a sub-hauler to deliver some of the pipe. Nunn owned and operated a truck and trailer used to haul the pipe.

Amaral agreed to furnish all dunnage required to transport the pipe to its destination. The dunnage used to secure the pipe consisted of (1) planks called stringers which were placed crosswise between the tiers of pipe; (2) tar paper used as a buffer between the pipes; and (3) chocks which kept the pipes in place. Chocks are wedge-shaped blocks of wood which are placed against the side of the pipe to keep it from sliding or rolling sideways and anchored to the stringers. The chocks remain in place while the load is in transit as well as during unloading.

Nunn was provided with the necessary stringers and tar paper by Amaral but was unable to find any chocks at Amaral's yard. At Southern's plant, he was given a bag of chocks by one of its employees. The chocks supplied to him were insufficient both in size as well as number to secure pipe of the weight and size being transported. Some of the chocks were cracked.

In loading the pipe, Nunn failed to place chocks between the pipes, although such a practice was a proper safety precaution. He placed chocks on the outside perimeter of each tier of pipe on some, but not all, of the stringers. The number placed by him was insufficient to secure the pipe properly. He failed to nail the chocks to the stringers in accordance with the accepted practice, but toenailed them against the sections of pipe.

Five tiers of pipe were loaded on his trailer. The three lower tiers were secured by a steel band. The entire load (including the two upper tiers) was held in place by three cables.

When Nunn arrived at Paradise, three of the latter's employees were directed to assist in unloading the pipe. One was the plaintiff, the others were the witnesses, Lester Upton and Alden Hess.

The procedure employed in unloading the pipe was as follows: After the three cables were removed, thus freeing the two top tiers, Hess, who operated a mechanically powered bucket, placed the lip of the bucket under the rear edge of a length of pipe. The pipe was then elevated a short distance. Upton and the plaintiff, who were on top of the load, then slipped a sling under the pipe near its center. Hess then lowered the pipe

---

[1]Throughout this opinion we designate the plaintiff Glen Kadelbach as plaintiff; defendants Amaral and Nunn as defendants; Paradise Irrigation District as Paradise and Southern Pipe and Casing Company as Southern.

to its former position on the trailer and drove the mechanized bucket to the side of the trailer at a point opposite the sling. The two men on top of the load then attached the sling to hooks welded to each side of the bucket. Hess then lifted the length of pipe a short distance above the rest of the load and signalled Nunn to pull the trailer forward. When the trailer had cleared the suspended pipe, Hess dropped it at the side of the road. He then signalled the driver to back the trailer to its initial location to enable another length of pipe to be unloaded in the same manner.

The plaintiff had no previous experience in this type of work, although earlier on that day, he had assisted in unloading a shipment of pipe without incident.

The first length of pipe on Nunn's trailer was removed without difficulty. While Nunn was backing his equipment into position for the removal of another length of pipe, he felt a sensation which led him to believe that the load had shifted. He yelled something to that effect to Hess. However, the noise of his motor and that of the mechanically operated bucket drowned out his words. Hess was aware only that Nunn had yelled something but had no comprehension of its purport. The plaintiff did not hear Hess's warning. Upton testified that he heard it. Nunn, however, at the direction of Hess, backed up his trailer to unload the second length of pipe. Upton also testified that he "felt" that the load might have shifted. He told plaintiff to be careful, to "watch it, you'll have to watch the load." He also testified that "we shrugged a few shoulders and went on to unload" the pipe. The plaintiff was unaware of any danger that the pipe would slide off the side of the truck.

While Nunn was backing up his equipment, Upton and the plaintiff resumed their place on top of the load preparatory to the removal of another length of pipe. Nunn stopped his backward movement with a light jerk. Almost instantaneously, the two top tiers of pipe began sliding off the side of the trailer. Upton jumped clear of the falling pipe and suffered no injury. The plaintiff was not so fortunate. One of his legs was crushed by a length of pipe. Later, it became necessary to amputate a portion of that leg.

The jury rendered a verdict in favor of the plaintiff and against defendants for $175,000. It rendered a special verdict finding that Paradise (plaintiff's employer) was negligent, and that such negligence contributed to the happening of the accident. After the entry of the verdict, the court, applying the rule in *Witt* v. *Jackson* (1961) 57 Cal.2d 57 [17 Cal.Rptr. 369, 366 P.2d 641], reduced the verdict by deducting all payments made to

the plaintiff by the compensation carrier for Paradise. Southern and defendant Red and Gray Trucking Company were exonerated from liability by the verdict. Prior to the return of the verdict, plaintiff and Southern settled plaintiff's claim against the latter. The amount of that settlement was later deducted from the verdict by the court. Only Amaral and Nunn appeal from the judgment.

No claim is made that excessive damages were awarded or that the evidence was insufficient to sustain the verdict. Defendants rely solely on claimed errors of law occurring at the trial which deprived them of a fair trial.

## The Law

Article VI, section 13, of the Constitution of the State of California, provides that no judgment shall be set aside for any error arising from the misdirection of the jury, the improper admission or rejection of evidence, or for any matter of procedure, unless, after an examination of the entire cause, including the evidence, *the appellate court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.*

Injury from error is never presumed and must be affirmatively shown. The burden rests on the complaining party to show not only error, but that it is sufficiently prejudicial to justify a reversal. (*Continental Dairy Equip. Co.* v. *Lawrence* (1971) 17 Cal.App.3d 378 [94 Cal.Rptr. 887]; *Charles C. Chapman Building Co.* v. *California Mart* (1969) 2 Cal.App.3d 846 [82 Cal.Rptr. 830].)

We discuss the alleged errors of law in the light of the foregoing principles.

1. Defendants urge that the court committed prejudicial error in imposing conditions on the use by the defendants of a magnetic tape recording of statements made by Hess and Upton.

A complete understanding of the basis for this claim of error requires a review of two pretrial orders made by the court. Plaintiff and Southern learned shortly before the trial that Hess and Upton had given tape-recorded statements to defendants' counsel, R. E. Burness. On May 10, 1971, they moved for discovery of its contents. The defendants opposed the motion, contending that the tapes were immune from discovery and were protected under the attorney's work product rule (Code Civ. Proc., § 2016, subd. (b)). The court denied the motion for discovery, with the *caveat,* however, that if either Hess or Upton were called as witnesses by the plaintiff, "before Mr. Burness asks his first question on cross-exami-

nation of either Hess or Upton, *if he is going to use the tape* he must at that time" make its contents available to counsel. (Italics added.)

The defendants, dissatisfied with this ruling, moved, on May 21, 1971, that the prior order be vacated and annulled. They cited sections 769 and 770 of the Evidence Code in support of their motion. The former section provides that in examining a witness at a trial concerning a statement made by him that is inconsistent with any part of his testimony, *it is not necessary to disclose to him any information concerning the statement.* The latter section provides that unless the interests of justice require otherwise, extrinsic evidence of a statement by a witness inconsistent with any part of his testimony is excluded, unless he is still on the stand and is given an opportunity to explain or deny the statement. The court denied the motion but amended its prior order as follows: "Prior to the examination of either Upton or Hess by Mr. Burness he will be expected to advise the opposition as to whether or not he intends to reveal his work product as a piece of impeaching evidence subject to discovery, whether they are being examined on direct, under 776, or on cross-examination at the time."

During the trial Hess was called as a witness by the plaintiff. He testified to the events relating to the plaintiff's accident. At the close of his direct examination, the jury was excused at the request of defendants' counsel. Counsel reiterated his objections to the pretrial orders of the court. He repeated his former claim that the contents of the tape were "work product."

During an ensuing lengthy colloquy between the court and counsel for all parties, defendants' counsel was repeatedly asked by the court *if he intended to use the tape* in cross-examining Hess. To such questions, his answers were vague, uncertain and equivocal, such as, he had made no decision as to whether to use it; at the present no decision to use it had been made; further examination or cross-examination of Hess might lead to its use; if he felt he needed the tape to impeach Hess or any other witnesses he would have used it; the tape is work product and he did not know what will come up; he had not made up his mind whether to use the tape or not depending on further developments at the trial.

Defendants' counsel conceded that the tape contained statements by Hess and Upton relating to the accident which would be admissible at the trial. At no time did he offer or attempt to make any showing of prejudice to defendants resulting from the disclosure to opposing counsel of the contents of the tape, although requested by the court so to do.

After a discussion that ranged over more than 70 pages of the record,

plaintiff's counsel stipulated that the tape might be played in the presence only of the court, the reporter and the clerk, and that its contents would not be divulged without a prior court order. After listening to the tape, the trial judge stated that the tape did, indeed, contain some statements by the witness Hess having relevance to the issue on trial, but that it also contained heresay and opinions which were inadmissible. Plaintiff's counsel's motion for leave to hear the recordings was denied. His motion for leave to hear only those portions of the tape containing statements made by the witness Hess relating to *the incident on trial was also denied.*

Thereafter, defendants' counsel cross-examined Hess at great length, during which he confronted Hess with numerous alleged prior contradictory statements which he read from his pretrial deposition. *At no time during Hess' cross-examination, re-direct, or recross-examination did the court or any counsel use or in any way refer to the tape recording.*

Later in the trial, the defendants called Upton as their own witness. At no time during his testimony was the slightest reference made by anyone to the tape or its contents. In fact, from the moment the court ruled that no part of the tape would be made available to plaintiff's attorney, *it was never again mentioned.*

Defendants urge that the court's rulings deprived them of the right to surprise Hess on cross-examination by withholding from him any information regarding the statement and not giving him an opportunity to read it. ■ Such a procedure is authorized by section 769 of the Evidence Code. That section, however, applies only to *witnesses, not lawyers.* There are compelling reasons why opposing counsel should be permitted, during a trial, to examine the contents of a written or recorded statement prior to and during its use in the cross-examination of a witness. Such a policy safeguards the witness against inadvertent or intentional misquotation of his prior statement. Opposing counsel are afforded an opportunity to make timely objection to the use of inadmissible or highly prejudicial statements prior to their disclosure to the jury. It gives opposing counsel an opportunity to object to the use of selected parts of a statement taken out of context whose meaning is explained or modified by surrounding matter as well as truncated segments of sentences which only partially express their full meaning. Such a rule gives assurance that the statement will be fairly used in cross-examination, and that no unfair advantage will be taken of a witness. This procedure has traditionally been observed in trial courts where medical reports, written expert opinions, pretrial depositions and similar material are used in the cross-examination of a witness.

■ Moreover, work product, itself, loses statutory protection when

used as an offensive weapon for cross-examination or to refresh the recollection of a witness. (*Bolles* v. *Superior Court* (1971) 15 Cal.App.3d 962 [93 Cal.Rptr. 719]; *Scotsman Mfg. Co.* v. *Superior Court* (1966) 242 Cal.App.2d 527, 531 [51 Cal.Rptr. 511].)

This is not to say that opposing counsel may disclose to the witness the contents of the statement or recording prior to its use. On proper application, the witness can be isolated from opposing counsel until the completion of the cross-examination. This is precisely what occurred here. The trial court notified defendants' counsel that it would forbid communication between the witness and opposing counsel to whom the statement had been disclosed until the close of the cross-examination. Defendants' counsel, however, rejected this offer.

Defendants also overlook the firm control which courts have traditionally exercised over the examination and cross-examination of witnesses.

In *Garcia* v. *Hoffman* (1963) 212 Cal.App.2d 530 [28 Cal.Rptr. 98], the court stated at page 536: "The scope of cross-examination is committed to the sound discretion of the trial court, and its ruling thereon will not be disturbed on appeal in the absence of a clear showing of abuse of that discretion."

Finally, defendants urge that, *as a matter of law,* written or recorded statements of witnesses *made to an attorney* are protected against discovery by section 2016, subdivision (b), of the Code of Civil Procedure as work product. ■ Such a view is not supported by the authorities. In *Mack* v. *Superior Court* (1968) 259 Cal.App.2d 7 [66 Cal.Rptr. 280], the court stated at page 10: "Information regarding events provable at trial, or the identity and location of physical evidence, cannot be brought within the work product privilege simply by transmitting it to the attorney." The court there defined protected derivative material as diagnosis, audit reports, appraisals and expert opinions developed as the result of the initiative of counsel.

Defendants' counsel cites, contra, a decision of this court, to wit: *Southern Pac. Co.* v. *Superior Court* (1969) 3 Cal.App.3d 195 [83 Cal.Rptr. 231], in support of his contention. In *Southern Pac. Co., supra,* we issued a peremptory writ of mandate granting defendant discovery of information relating to allegations of negligence charged in the complaint obtained by the plaintiff through private investigators. There, the claim was made that the information so obtained was privileged as work product. We cited with approval *Mack* v. *Superior Court, supra.* However, in our opinion the following statement appears (at p. 198): "The interrogatories did not

seek *derivative material* in the attorney's possession *such as statements of witnesses, . . .*" (Italics added.)

In the same decision, however, we held that facts *"relied upon by plaintiffs to prove their case, are discoverable no matter how they came into the attorney's possession." (Id.* at p. 199.) (Italics added.)

To clear up this contradiction, we hereby disapprove our holding in *Southern Pac. Co.* v. *Superior Court, supra,* that statements of witnesses come within the definition of protected derivative material.

■ The tape recording has not been made a part of the record on appeal. Defendants' counsel has not augmented the record by including it therein. This court has no means of ascertaining whether the whole or any part of the tape was entitled to protection as work product or, if so, whether defendants' rights would have suffered any prejudice had opposing counsel been permitted to hear it.

2. Defendants contend that the court committed prejudicial error in denying him the right to speak to the defendant Nunn during a recess. ■ While Nunn was being examined as an adverse witness pursuant to section 776, Evidence Code, one of the jurors suddenly developed a coughing spell. At that juncture, Nunn was being subjected to a vigorous and penetrating cross-examination. The court declared a brief recess and the jury was excused.

Plaintiff's counsel then moved that Nunn be barred from talking to his attorney during the recess. Defendants' counsel strenuously objected to this request. The court pointed out that the recess was not one which normally would have been called, but was occasioned solely by the distress of a juror. It ruled that Nunn would not be permitted to communicate with his attorney during the brief recess. When defendants' counsel continued to press his objections to this ruling, the court inquired if he wished to make an offer of proof of prejudice. Defendants' counsel then replied: "Well if your Honor please the only thing, to be very clear about it I would want to say to the witness would be that *'speak up.'* I mean that is not—I'm not going to stand here and coax him or anything, just ask him to speak up." (Italics added.) Thereafter, the court recalled the jury and advised Nunn to raise his voice and make sure that the jurors and counsel could hear all of his responses.

We find no error in the court's ruling and no prejudice to the defendants' rights by its ruling. Counsel accomplished his purpose when the court admonished the witness to raise his voice. The court exercised the wide dis-

cretion vested in it over the examination and cross-examination of witnesses. We find no abuse of that discretion.

3. Defendants contend that the failure of the court to give an instruction on assumption of risk constituted prejudicial error. The court gave the standard instructions on contributory negligence. The remaining question is whether the facts support an instruction on assumption of risk.

In *Vierra* v. *Fifth Avenue Rental Service* (1963) 60 Cal.2d 266 [32 Cal.Rptr. 193, 383 P.2d 777], the court distinguished the respective doctrines of assumption of risk and contributory negligence as follows on page 271: "The doctrine is to be distinguished from contributory negligence (see Note 82 A.L.R.2d 1218), although the two may arise from the same set of facts and frequently overlap. But the two doctrines are essentially different. Contributory negligence arises when the plaintiff fails to exercise due care. *Assumption of risk arises regardless of the degree of care used. It is based, fundamentally, on consent.* Contributory negligence is not." (Italics added.)

The court continued at page 271: "To warrant the application of the doctrine the evidence must show that the victim appreciated the *specific danger* involved. *He does not assume any risk he does not know or appreciate.* (See generally 35 Cal.Jur.2d, Negligence, § 266, p. 814 et seq.) Stated another way, before the doctrine is applicable, the victim must have not only *general knowledge* of a danger, but must have knowledge of the *particular danger,* that is, knowledge of the *magnitude of the risk involved.*" (Italics added.)

The court then quoted from Dean William Prosser in his work on Torts where he stated: " ' "Knowledge of the risk is the watchword of assumption of risk." Ordinarily the plaintiff will not be taken to assume any risk of conditions or activities of which he is ignorant. Furthermore, he must not only know of the *facts which create the danger,* but he must comprehend and appreciate the danger itself. . . . If because of age, or *lack of information or experience, he does not comprehend the risk involved in a known situation, he will not be taken to consent to assume it.* His failure to exercise ordinary care to discover the danger is not properly a matter of assumption of risk, but the defense of contributory negligence.' " (*Ibid.*) (Italics added.)

In *Carr* v. *Pacific Tel. Co.* (1972) 26 Cal.App.3d 537 [103 Cal.Rptr. 120], the deceased, a well-trained and experienced tree trimmer, was killed while cutting down a tree suspended against a number of taut telephone wires. After some of the higher branches of the tree had been removed,

thus reducing its pressure against the wires, the tension of the wires caused the tree to spring into the air resulting in plaintiff's death. The court gave an instruction on assumption of risk. Judgment for the defendant was reversed on appeal, the court holding that the instruction given constituted prejudicial error, and stating at page 542: "Assumption of risk is different than [*sic*] contributory negligence and trial courts should be cautious in instructing on the former. Assumption of risk should only be allowed as a defense where there is proof that the plaintiff had *knowledge of the particular risk, appreciated the magnitude thereof,* and *voluntarily assumed the same.*" (Original italics.)

The evidence showed that the plaintiff did not' have knowledge of the particular or specific danger that precipitated the accident, namely that the pipes would slide off the side of the trailer while he was stationed on top of them. He had no knowledge that they had not been adequately secured against that eventuality. He had no prior experience with unloading pipe. Whatever warnings he received gave him no inkling of the particular danger which caused the accident.

Moreover, his fellow workmen, all of whom possessed experience in unloading pipe, continued, without interruption, to proceed with the unloading after they became aware of the slippage of the load. Such conduct on their part was an assurance to plaintiff that, whatever they had noticed, it was not sufficiently hazardous to halt or endanger the unloading operation.

Viewing the evidence as a whole and drawing therefrom all reasonable inferences most favorable to the defendants, it can, at most, be concluded that the plaintiff had an awareness of general danger. There is no evidence that he voluntarily assumed the risk of any specific or particular hazard. The essential elements required to support an instruction on assumption of risk, namely " 'to relieve the defendant of an obligation of conduct toward him, and to take his chances of harm from *a particular risk,*' " as well as knowledge of it, are not present here. (*Vierra* v. *Fifth Avenue Rental Service, supra,* 60 Cal.2d at p. 271.) (Original italics.)

We find no error in the court's rulings, and affirm the judgment.

Richardson, P. J., and Regan, J., concurred.

A petition for a rehearing was denied May 10, 1973, and the opinion was modified to read as printed above. Appellants' petition for a hearing by the Supreme Court was denied June 20, 1973.