71 Cal.App.3d 841 (1977)
139 Cal. Rptr. 888
CAROL ANN BROKOPP et al., Plaintiffs and Respondents,
v.
FORD MOTOR COMPANY, Defendant and Appellant.
Docket No. 15804.
Court of Appeals of California, Fourth District, Division Two.
July 19, 1977.
*847 COUNSEL
Gibson, Dunn & Crutcher, G. Edward Fitzgerald, Dale F. Kinsella, Douglas M. Hindley and W. Mike McCray for Defendant and Appellant.
Golden, Neal & Shuffler and Kenneth J. Golden for Plaintiffs and Respondents.
OPINION
KAUFMAN, J.
In this action to recover damages for personal injuries sustained in a single-vehicle accident, defendant Ford Motor Company (Ford) appeals from a judgment entered upon a jury verdict in favor of plaintiffs Robert and Carol Brokopp (plaintiffs) in the amount of $3,010,000.
Named as defendants in addition to Ford were Sunset Ford, Inc. (Sunset), a Ford dealer, and Recreational Vans, Inc. (Recreational), a supplier of recreational vehicles. The case went to the jury on theories of strict tort liability and negligence as to Ford and Sunset and on the *848 theory of strict tort liability only as to Recreational. The jury returned a verdict of $10,000 in favor of Mrs. Brokopp and $3 million in favor of Mr. Brokopp, both as against Ford and Sunset. Recreational was exonerated. In its verdict the jury attempted to apportion liability for the judgment $2,007,500 to Ford and $1,002,500 to Sunset. The court struck the attempted apportionment as surplusage and entered judgment on the verdict. After rendition of judgment Sunset apparently paid plaintiffs $1,250,000 in return for a release from liability as to Sunset only.

FACTS
Inasmuch as Ford does not challenge its sufficiency, it is unnecessary to attempt to summarize the voluminous evidence. A brief statement should suffice.
In June 1973 Mr. Brokopp, a sales manager employed by Sunset, ordered from Recreational through Sunset an Econoline Ford van to be converted into a motor home. The van, which was ordered with factory power steering but without factory air conditioning, was converted by Recreational and, on July 3, 1973, was delivered to Sunset where Mr. Brokopp took possession of it. The van was manufactured, of course, by Ford.
On July 4, Mrs. Brokopp drove the van from Yorba Linda to Corona. She had great difficulty steering. Later that day Mr. Brokopp noticed the power steering belt was hanging underneath the vehicle. He and his father attempted to replace the belt, but each time the engine was started, the belt would come off. The next day Mr. Brokopp drove the van to Sunset and had the lot man attempt to replace the belt. Again, each time the engine was started, the belt would come off.
On July 6 Mr. Brokopp took the van to the service department at Sunset for correction of the power steering problem and installation of a non-Ford air conditioner. A mechanic undertook the work. In order to install the air conditioner it was necessary to remove the power steering pump bracket, a part manufactured to Ford's specifications by a subcontractor and installed by Ford. Viewing the evidence most favorably to the judgment, the mechanic discovered a defect in the power steering pump bracket resulting in a misalignment between the power *849 steering pump pulley and the crankshaft pulley upon which the power steering belt revolved. Rather than replacing the defective bracket, the mechanic attempted to remedy the defect by the use of shims and spacers.
Approximately one month later, as Mrs. Brokopp was driving the van in Mexico with Mr. Brokopp as a passenger, the vehicle was involved in a single-car accident while traveling between 45 and 60 miles per hour. Mr. Brokopp sustained severe injuries with the result that he is now a quadraplegic. Mrs. Brokopp sustained an assortment of relatively minor injuries. It was plaintiffs' theory that the power steering pump bracket was defective, that Sunset's mechanic did not cure the defect and that the resulting misalignment caused or permitted the power steering belt to come off one of its pulleys with a resultant loss of power steering which caused Mrs. Brokopp to lose control of the vehicle and crash.

CONTENTIONS, DISCUSSION AND DISPOSITION
Ford asserts numerous errors. Plaintiffs contend in each instance that there was no error or that any error was waived or was harmless.

Restricted Cross-Examination of Plaintiffs' Experts
(1) Each party called numerous expert witnesses. Ford complains that the court erroneously precluded it from asking two of plaintiffs' experts certain questions pertaining to their compensation.
Both Mr. Clement and Dr. Sommer gave testimony important to plaintiffs' case on the issue of causation. On cross-examination, Ford's counsel, among other things, attempted to show self-interest and bias on the part of these witnesses by inquiring into their compensation. He asked Mr. Clement at what rate he was billing plaintiffs. He asked Dr. Sommer whether his bill had been paid by plaintiffs. Plaintiffs' objections to these questions were sustained.
As plaintiffs virtually concede, these rulings were contrary to Evidence Code section 722, subdivision (b) which provides: "The compensation and expenses paid or to be paid to an expert witness by the party calling him is a proper subject of inquiry by any adverse party as relevant to the credibility of the witness and the weight of his testimony."
*850 Plaintiffs contend, however, that these errors were not prejudicial. We agree. While Ford was precluded from obtaining the answers to these two specific questions, it was not prevented generally from inquiring into this subject. It was permitted to elicit from Mr. Clement the number of hours he spent on the case, the fact that he had submitted bills for his services and the fact that his fees were not contingent on the outcome of the case. It was permitted to elicit from Dr. Sommer the number of hours he and his associate had spent on the case, the hourly charge for his services and the fact that he had submitted bills for his services. He was not asked, as was Mr. Clement, whether payment of his fees was contingent on the outcome of the case. The court's ruling did not inhibit Ford's counsel in attacking the credibility of plaintiffs' experts. In his arguments to the jury, Ford's counsel hammered on the fact that plaintiffs' experts had only a combined experience of four years and yet were being paid $20,000 to $25,000 for their services. There is no reasonable probability that these minor errors could have affected the outcome of this case which was tried over a period in excess of two and one-half months.

Proof of Negligent Inspection by Incompetent and Irrelevant Evidence
(2a) Plaintiffs' theory of negligence against Ford was that Ford negligently failed to inspect for and negligently failed to discover the defect in the power steering pump bracket. To prove Ford's negligence in that respect, plaintiffs were permitted to introduce evidence that an entirely different component of the vehicle, namely, the connection between the Pitman arm and the sector shaft, was defectively manufactured and negligently inspected. After the accident the connection between the Pitman arm and the sector shaft of the van was found broken. There was no evidence whatever, however, that the accident was in any way caused by this break. In fact, the experts were unanimous in concluding that the break was caused by the crash. Moreover, although the Pitman arm-sector shaft junction is a part of the steering system, it has nothing whatever to do with the power steering pump bracket, the power steering belt or its pulleys. Nevertheless, over Ford's strenuous objections, plaintiffs were permitted to introduce physical evidence and expert testimony, that the Pitman arm-sector shaft junction was imperfectly manufactured and would have broken at some point during the *851 life of the vehicle, which would have resulted in a complete loss of steering. It was plaintiffs' theory that if Ford was negligent in failing to discover this very important defect, it must also have been negligent in failing to discover the defect in the power steering pump bracket.
It was error to permit plaintiffs to attempt to prove Ford's negligence in failing to discover the defect in the power steering pump bracket by evidence of its negligence in failing to discover the defect in the Pitman arm-sector shaft junction. Evidence of a trait of character (disposition to negligence) is inadmissible when offered to prove conduct on a specified occasion. (Evid. Code, § 1101, subd. (a); cf. Marocco v. Ford Motor Co., 7 Cal. App.3d 84, 91-92 [86 Cal. Rptr. 526].) "[E]vidence of a trait of a person's character with respect to care or skill is inadmissible to prove the quality of his conduct on a specified occasion." (Evid. Code, § 1104; Carr v. Stern, 17 Cal. App. 397, 406-407 [120 P. 35].) "It is a fundamental rule of evidence that you cannot prove the commission of an act by showing the commission of similar acts by the same person at other times and under other circumstances. Such evidence is simply not relevant...." (Larson v. Larsen, 72 Cal. App. 169, 172 [236 P. 979]; cf. Marocco v. Ford Motor Co., supra; see Evid. Code, § 1101, subd. (b); Witkin, Cal. Evidence (2d ed.) § 350, pp. 309-310.)
As authority to the contrary, plaintiffs cite Mattox v. Isley, 111 Cal. App.2d 774 [245 P.2d 664]. In that case a child had been injured in a theater by a sharp-edged metal band protruding from the back of the seat behind which the child was sitting. Plaintiffs say that the plaintiff there was permitted to show that numerous seats in the theater were similarly defective and that, thus, the case is authority for the admission of the challenged evidence in the case at bench. Not so.
It is true that the opinion notes that many seats throughout the theater suffered from the same defect (111 Cal. App.2d at p. 776), but we are not told how that fact came into evidence. For all we know it may have come in without objection. There is no consideration or discussion in the opinion of the admissibility of that evidence. (3) A case is not authority for propositions not presented or considered. (General Motors Accept. Corp. v. Kyle, 54 Cal.2d 101, 114 [4 Cal. Rptr. 496, 351 P.2d 768]; Grant v. Murphy, 116 Cal. 427, 432 [48 P. 481]; Hart v. Burnett, 15 Cal. 530, 598-599.) Moreover, in Mattox there was a serious question of notice *852 to the theater operator of the dangerous condition of the seat (111 Cal. App.2d at p. 778), and the evidence that many seats were defective may have been admissible on that issue. (See Evid. Code, § 1101, subd. (b).)
(2b) At oral argument plaintiffs urged for the first time a new theory of admissibility. The theory is as follows. Ford admitted it did not inspect for specific defects and urged that such inspections were unnecessary because a 15-minute functional test of a vehicle after it was assembled would disclose any such defect. It was, thus, proper for plaintiffs to prove the defective condition of the Pitman arm-sector shaft junction to show that the functional test employed by Ford was not adequate to disclose all serious defects.
Assuming, without deciding, that evidence of the disrelated defect and Ford's negligent failure to discover it would have been admissible on plaintiffs' lately discovered theory,[1] the theory is fatally flawed. While Ford did take the position that the functional test would disclose a defect in the power steering pump bracket that would cause a misalignment of the pulleys sufficient to cause the power steering belt to come off,[2] Ford did not take the position that its 15-minute functional test would disclose the defect in the Pitman arm-sector shaft junction.[3] Indeed, it would have been nonsensical to do so, for all witnesses were agreed that, unlike the defect in the power steering pump bracket, the defect in the Pitman arm-sector shaft junction would not manifest itself until after some considerable period of use. Since the two defects were entirely dissimilar in this vital aspect and since the testing for the two defects was different, proof that Ford negligently failed to detect the Pitman arm-sector shaft junction defect was not relevant to prove it was negligent in failing to discover the defect in the power steering pump bracket.
*853 (4) We cannot subscribe to the view that the challenged evidence was admissible in the discretion of the trial court under Evidence Code section 352.[4] To be so admissible, the evidence must be relevant (Evid. Code, § 350), that is, it must tend logically, naturally and by reasonable inference to establish a material fact. (People v. Jones, 42 Cal.2d 219, 222 [266 P.2d 38]; People v. Warner, 270 Cal. App.2d 900, 907 [76 Cal. Rptr. 160]; see also Evid. Code, § 210.) Here, as already demonstrated, because of the essential dissimilarity of the defects and the different modes of testing, proof that Ford was negligent in not discovering the defect in the Pitman arm-sector shaft junction did not tend logically, naturally or by reasonable inference to establish Ford's negligence in failing to discover the defect in the power steering pump bracket.
It is true that at one point Ford's counsel requested the court to exercise its discretion and exclude the challenged evidence because it was unduly prejudicial, but, fairly viewed, that request was only a last, desperate effort to have the challenged evidence excluded and came only after strenuous argument covering five pages of transcript that the evidence was inadmissible because it was irrelevant. The trial court was more than adequately alerted to Ford's claim of irrelevancy.
(5) The more difficult question is whether the error compels reversal. We are enjoined: "No judgment shall be set aside ... on the ground of ... the improper admission ... of evidence ... unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13; see also Evid. Code, § 353, subd. (b).) A miscarriage of justice should be declared only when the reviewing court is convinced after an examination of the entire case, including the evidence, that it is reasonably probable a result more favorable to the appellant would have been reached absent the error. (Code Civ. Proc., § 475; People ex rel. Dept. of Public Works v. Graziadio, 231 Cal. App.2d 525, 532 [42 Cal. Rptr. 29]; Williams v. Lambert, 201 Cal. App.2d 115, 126 [19 Cal. Rptr. 728]; Taylor v. Pacific Container Co., 148 Cal. App.2d 505, 513 [306 P.2d 1049].) Prejudice from error is never presumed but must be affirmatively demonstrated by the *854 appellant. (Kadelbach v. Amaral, 31 Cal. App.3d 814, 819 [107 Cal. Rptr. 720]; Continental Dairy Equip. Co. v. Lawrence, 17 Cal. App.3d 378, 384 [94 Cal. Rptr. 887].) Whether an error is reversible depends on the facts and circumstances of the particular case under review. (Bridgman v. Safeway Stores, Inc., 53 Cal.2d 443, 450 [2 Cal. Rptr. 146, 348 P.2d 696]; Butigan v. Yellow Cab Co., 49 Cal.2d 652, 661 [320 P.2d 500]; 6 Witkin, Cal. Procedure (2d ed.) p. 4278.)
(6a) Considering the entire record, including the evidence, we have concluded it is not reasonably probable that, absent the error, Ford would have prevailed. If, of course, the jury predicated Ford's liability on the theory of strict liability, no error in the evidence relating to negligence could be prejudicial. However, since the jury exonerated Recreational Vans, Inc. it appears probable that Ford's liability was predicated on negligence. Nevertheless, since plaintiffs' only theory of negligence against Ford was that Ford negligently failed to discover the defect in the power steering pump bracket which caused the accident, it must be inferred that the jury found the power steering pump bracket defective and found that that defect caused the accident. If that be so, Ford was liable as a matter of law as a manufacturer of a defective product.
In this connection, we note that there could not have been any confusion in the minds of the jurors between the defect in the power steering pump bracket and the defect in the Pitman arm-sector shaft junction, for plaintiffs' counsel made it perfectly clear that he did not claim the Pitman arm-sector shaft junction defect in any way caused the accident. In his closing argument he stated: "And you know Mr. McCray [Ford's counsel] told you that Mr. Golden [plaintiffs' counsel] is the only one that told you that spline problem had anything to do with the accident. [¶] I didn't say it had anything to do with the accident. I don't think any of you got that idea. I said it shows how badly they inspect  if they have this, they would allow a defect in such an important place  allow it to come out of the plant."
We do not consider this to be a close case. The following facts were virtually uncontradicted: The power steering pump bracket had been improperly machined and was defective; as a result of the defect and the resulting misalignment, the power steering belt repeatedly came off *855 immediately after plaintiffs took possession of the vehicle; the dealer attempted to correct the misalignment by shims and spacers without replacing the defective bracket; and examination of the vehicle immediately after the accident revealed that the power steering belt was off the crankshaft pulley. In its closing brief, Ford directs us to certain evidence favorable to it and urges that this was a close case. (7) However, as our Supreme Court has aptly said: "The greater number of witnesses or quantity of evidence on one side does not mean that a case is close; nor does a sharp conflict in the evidence make it so. If it did, practically every vigorously contested case would be a close one." (Hatfield v. Levy Brothers, 18 Cal.2d 798, 815 [117 P.2d 841]; Marocco v. Ford Motor Co., supra, 7 Cal. App.3d at pp. 95-96.)
(6b) All parties recognize that the central and crucial question in the case was whether the power steering belt came off before or as a result of the impact. This was brought home to the jury in the arguments of counsel for each of the parties. The error did not go to this question.
Ford asserts that the erroneous introduction of evidence of the Pitman arm-sector shaft junction defect enabled plaintiffs to make an inflammatory argument to the jury to the effect that Ford would rather pay injury judgments than spend the money necessary properly to inspect its vehicles[5] and points to the jury's attempt to apportion two-thirds of the damages to Ford as indicating the jury was inflamed against Ford. We are not persuaded.
Ford's conclusion from the jury's attempt to apportion the damages two-thirds to Ford that the jury was inflamed against Ford is sheer speculation and conjecture. From the verdict form which was used,[6] the *856 jury might well have been confused. Alternatively, the jury might well have felt that Ford was the one who should bear the heavier loss because it manufactured the defective automobile whereas Sunset attempted only to correct the defect. To infer passion and prejudice against Ford because of the attempted apportionment of damages is unwarranted.
In any event, plaintiffs could have made the same or essentially the same argument to the jury even without any evidence of the Pitman arm-sector shaft junction defect. Ford's expert testified that Ford did not inspect the power steering pump bracket after it reached the Ford plant, but relied upon its functional testing to uncover defects in this part. (See fn. 2, ante.) This evidence along with the obvious fact that the functional testing had not disclosed the defective power steering pump bracket on the vehicle sold to plaintiffs was sufficient basis for the argument made.
It is most probable that, had the evidentiary error not occurred, the result in the case would have been the same.

Work Product
(8a) Both sides presented testimony concerning the effect loss of power steering would have on the driver's ability to control a vehicle of the type plaintiffs were driving. Ford presented evidence through its engineers, Mr. Valant and Mr. Brink, and lay witnesses who participated in tests to show that at a speed of between 50 - 55 miles per hour the driver would not be able to tell whether the power steering was on or off.
Ford complains that the court erred in requiring it to provide plaintiffs' counsel with a copy of the data developed by Ford's expert *857 depicting the results of the tests conducted by them on the effect of turning off the power steering at various speeds. Ford contends that the data was compiled for the use of its attorney and constituted nondiscoverable work product. The contention lacks merit.
(9) Initially, "[i]t seems doubtful if the alleged work product privilege can ever be claimed at the time of trial. It is not one of the privileges enumerated in the Evidence Code. Provisions as to work product found in Code of Civil Procedure section 2016 do not use the work [sic] privilege and are in the nature of statutory limitations on pretrial discovery." (Mize v. Atchison, T. & S.F. Ry. Co., 46 Cal. App.3d 436, 448-449 [120 Cal. Rptr. 787].)
(8b) But even assuming the privilege can be asserted at trial, Ford's contention lacks merit. In response to interrogatories less than one month before trial began, Ford stated: "In part, we also expect we will use Mr. Harrison Brink, an experienced accident reconstructionist ... to analyze the testimony of ... [plaintiffs' experts], and will participate in testing similar to that as testified to by ... [plaintiffs' experts] on March 7, 1975, that they intended to perform.... [¶] We also anticipate there will be engineers, technicians and photographers who will participate in running the tests, similar to those which ... [plaintiffs' experts] testified to on March 7, 1975, that they intend to run between March 7, 1975 and the time of trial. [¶] At this time we do not know the names and addresses of such persons, but we do not believe they will be witnesses unless it becomes necessary in order to lay a foundation as to the tests to be conducted."
(10) "The knowledge, opinions, and report of an expert consulted by an attorney in preparation of his case remain immune from disclosure under the attorney's work-product privilege as long as the expert does not change his status as a consultant-expert. If the attorney doesn't use and does not communicate a decision to use the expert as a witness, the adverse party may not obtain disclosure of the expert's knowledge, opinions, or report by means of any pretrial discovery vehicle or by calling the expert as a witness at the trial.... [¶] However, once it appears reasonably certain that the consultant-expert is to become a witness in the action, the attorney's work-product privilege terminates and the expert's knowledge and opinions are subject to discovery and disclosure. This rule of termination is one of fairness. The attorney who *858 employed the expert cannot be permitted to still assert the attorney's work-product privilege after a decision has been made that the expert's knowledge and opinions are to be thrust into the evidence arena." (Jefferson, Cal. Evidence Benchbook (1972) § 41.1, pp. 704-705 (original italics); see also Tip Top Foods, Inc. v. Lyng, 28 Cal. App.3d 533, 553 [104 Cal. Rptr. 718]; Bolles v. Superior Court, 15 Cal. App.3d 962, 963 [93 Cal. Rptr. 719].)
(8c) Since Ford determined well in advance of trial that at least Mr. Brink, the coordinator of Ford's tests, would be called to testify, the work product privilege was inapplicable.

Income Tax Consequences
Plaintiffs presented expert testimony by Dr. Heliker, an economics professor at the University of Montana, as to what Mr. Brokopp's future earnings might have been had he not been disabled. Dr. Heliker testified that in 30 years Mr. Brokopp would have been earning as much as $354,000 a year. He also testified concerning the likely rate of return on any amount awarded Mr. Brokopp. On cross-examination counsel for Ford asked Dr. Heliker: "Doctor, going to your figures, are you taking into consideration the fact any judgment given would be tax free?" Plaintiffs' objection on grounds of irrelevancy and immateriality was sustained. Later in the cross-examination the following occurred:
"Q. If you had a man, $354,000 you said he'd be making 30 years from now, how much of that would be spendable?
"A. How much of that would be what?
"Q. Spendable.
"A. I don't know what you mean by that.
"Q. Are you talking about the difference between tax free bonds and so forth for the interest rates, how much of that 354,000 would be spendable?
"A. You mean after taxes?
*859 "Q. Yes.
"A. I couldn't tell you.
"Q. Everything over 100,000 would be taxed at 70 percent, wouldn't it?
"A. Or 90 percent, I believe.
"MR. GOLDEN: I will object to that, Your Honor. That assumes facts not in evidence, as assumption what the tax structure would be in the year 2003, and assumes things not in evidence.
"THE COURT: Sustained."
(11) Where the court sustains an objection to a question, the ruling will be affirmed on appeal if the question was objectionable on any ground. (See 6 Witkin, Cal. Procedure (2d ed.) pp. 4216-4217 and cases there cited.) Plaintiffs contend the questions were ambiguous and assumed facts not in evidence. The first question assumed the fact that a judgment would be tax free, and there was no evidence to that effect. The last question assumed that the tax rates would be the same in 2003 as they were at the time of trial. There was no evidence of that fact. The trial court was, therefore, correct in sustaining objections to these questions.

Misconduct of Counsel
(12a) Ford contends that, in arguing to the jury, counsel for plaintiffs was guilty of several acts of prejudicial misconduct, to wit: (1) he made a variant of the "golden rule" argument; (2) he made an appeal to the sympathy of the jury based on Ford's size and corporate status; (3) he expressed his personal opinion on the credibility of several of Ford's expert witnesses; (4) he made an appeal to the self-interest of the jurors as taxpayers; and (5) he argued a matter not in evidence and, indeed, contrary to all of the pertinent expert testimony. Although in all but one instance we agree that the substance of Ford's charges is correct, Ford is foreclosed from asserting these defects as grounds for reversal because it failed to make an adequate record below. Misconduct of counsel may *860 not be urged as a ground for reversal absent both timely objection and request for admonition in the trial court. (Sabella v. Southern Pac. Co., 70 Cal.2d 311, 318 [74 Cal. Rptr. 534, 449 P.2d 750]; Horn v. Atchison, T. & S.F. Ry. Co., 61 Cal.2d 602, 610 [39 Cal. Rptr. 721, 394 P.2d 561]; see 4 Witkin, Cal. Procedure (2d ed.) p. 2983.)
(13) In his opening argument plaintiffs' counsel made a number of statements from which the jury might have inferred it was proper in calculating damages to place themselves in Mr. Brokopp's shoes and award the amount they would "charge" to undergo equivalent disability, pain and suffering. This so-called "golden rule" argument (see Beagle v. Vasold, 65 Cal.2d 166, 182, fn. 11 [53 Cal. Rptr. 129, 417 P.2d 673]) is impermissible. (Horn v. Atchison, T. & S.F. Ry. Co., supra, 61 Cal.2d at p. 609; Neumann v. Bishop, 59 Cal. App.3d 451, 484-485 [130 Cal. Rptr. 786].) But Ford's counsel neither objected to the statements nor requested any admonition. (12b) A party is foreclosed from complaining on appeal of misconduct during arguments to the jury where his counsel sat silently back during the arguments, allowed the alleged improprieties to accumulate without objection, and simply made a motion for a mistrial at the conclusion of the argument. (Horn v. Atchison, T. & S.F. Ry. Co., supra, 61 Cal.2d at pp. 610-611.)
Counsel for plaintiffs also argued: "Save a buck, and that is the only reason I can think of why they would handle things the way they do. These large corporations, in effect, crippled Bob; they took his manhood away from him; they took his privacy from him; they took his body away from him; and they left him in pain...."
(14a) Appeals to the sympathy of the jury based on the size or corporate status of a defendant are improper. However, Ford failed to object to this argument and requested no admonition.
In argument, counsel for plaintiffs also stated: "You know, in this trial, I never have had more evasive witnesses than Mr. Valant and Mr. Brink. I just never have seen witnesses as Mr. Valant and Mr. Brink who just would not answer a question."
Ford characterizes this as a statement of counsel's personal opinion on the credibility of these witnesses. We believe not. (15) An attorney is *861 permitted to argue all reasonable inferences from the evidence, and may with propriety comment on the demeanor of a witness indicating recalcitrance.
Moreover, again, Ford lodged no objection and requested no admonition with respect to this statement.
Counsel for plaintiffs also told the jury: "Bob doesn't have to stay at the V.A. hospital. I don't think that we, the taxpayers, ought to pay for Bob in preference to Ford, if they are liable." (14b) An appeal to the jurors' self-interest as taxpayers constitutes misconduct. (People ex rel. Dept. of Public Works v. Graziadio, supra, 231 Cal. App.2d at pp. 533-534.) Although Ford objected to this statement, it failed to secure a definitive ruling and requested no admonition. Any impropriety could easily have been remedied by a prompt and proper admonition.
Ford's contention that plaintiffs' counsel argued a matter not in evidence arises out of the following situation. It was important to plaintiffs' theory that the power steering belt came off its pulley while the pulley was in motion and not as a result of the crash. All the experts, including those called by plaintiffs, agreed that there were no marks on the belt from which it could be determined that the belt came off a moving pulley. Nevertheless, in his argument, counsel for plaintiffs insisted that he could see marks on the belt, implied that these marks indicated the belt had come off a moving pulley, and started to mark the belt with a yellow crayon. Sunset's counsel objected and argument was held outside the jury's presence. Ford's counsel adopted Sunset's objection and argument. The judge thereupon removed the crayon marks from the belt and ordered plaintiffs' counsel not to mark any exhibits. Proceedings were then resumed before the jury, and plaintiffs' counsel proceeded with his argument during which he told the jury that, if they would hold the belt down in the light, they would see two faint lines. No further objection, motion to strike, or request for admonition was interposed by the defense.
Ford urges that, although the belt was in evidence, there was no evidence whatever that any marks on the belt indicated the belt came off a moving pulley. Ford is correct. The belt was in evidence and counsel could argue that there were marks visible on it. It was improper, *862 however, to suggest to the jury that these marks indicated the belt came off a moving pulley. (16) While an attorney may argue all reasonable inferences from the evidence (Beagle v. Vasold, supra, 65 Cal.2d at p. 176), it is misconduct to argue matters not in evidence or to assert as fact matters allegedly within counsel's personal knowledge. (Malkasian v. Irwin, 61 Cal.2d 738, 745-747 [40 Cal. Rptr. 78, 394 P.2d 822]; 4 Witkin, Cal. Procedure (2d ed.) pp. 2996-2997.)
However, that was not the thrust of the defense objection. Although this particular portion of the argument covers several pages of transcript, it was not until plaintiffs' counsel started marking the belt with yellow crayon that the defense objected, and the trial court justifiably understood the objection as being against counsel's marking the exhibit. This impropriety the trial court corrected. Argument thereafter resumed without further objection or any request for admonition by defense counsel. The impropriety now asserted was waived.

Satisfaction of Judgment
(17) From instruments attached to Ford's opening brief it appears that after entry of judgment and prior to this appeal Sunset paid plaintiffs $1,250,000 in return for a release from further liability. Ford asserts that the effect of this document is a full satisfaction and that it is thereby discharged from further liability on the judgment. This contention is based on events occurring after judgment and on matter outside the record on appeal and is not, therefore, properly considered by us on this appeal. (Gantner v. Gantner, 39 Cal.2d 272, 278 [246 P.2d 923]; Loving & Evans v. Blick, 33 Cal.2d 603, 613-614 [204 P.2d 23].)
The judgment is affirmed.
Morris, J., concurred.
TAMURA, Acting P.J.
I concur with the majority's disposition of the case and with its analysis of the issues except in one important respect. I am constrained to disagree with its treatment of the only important legal issue in the case of precedential value: The admissibility of evidence of the defect in another component of the steering mechanism of the vehicle. The evidence was received, not to show there was a defect in the *863 part claimed to have caused the accident, but to show that Ford negligently discharged its duty to inspect for defects. The majority holds that admission of the evidence for the purpose for which it was offered and received constituted error. I disagree.
As part of their case in chief, plaintiffs called defendant's expert and reviewed through him the inspection and testing procedures employed by Ford to detect defects in the power steering pump bracket. Ford's engineer testified that other than a visual check by the assembly line worker for significant misalignment and a functional test by running the car for approximately 15 minutes, no specific check was made to determine whether the power steering pump pulley was properly aligned. He explained that Ford relied upon what he termed the "dimension-arrived-at" theory which in substance means that if all of the parts have been manufactured to Ford's specifications and are properly assembled, the end product would be free of defects. The engineer testified that the "dimension-arrived-at" theory and its assumptions applied to "the vast majority of the assembly things that Ford does at their plant." Failure to discover the defect in the Pitman arm-sector shaft assembly thus had some probative value on the issue of whether the "dimension-arrived-at" assumption augmented by visual inspection as the product went down the assembly line satisfied the manufacturer's duty to inspect for defective condition of its product.[1]
The majority holds that the evidence had no probative value because Ford relied in part on the functional test to uncover any misalignment of the power steering pump pulley but not with respect to any defect in the Pitman arm-sector shaft assembly. However, the only evidence respecting Ford's inspection for defects in the latter component was the following testimony by its engineer: "Well, that is a different matter. Now, we are back at the  the steering gear is assembled, put on back at the head of the chassis line, that is inspected, that is visually inspected by the  when it comes down the chassis line."
*864 The vague testimony by Ford's engineer does not show that a wholly different inspection procedure was used for the Pitman arm-sector shaft assembly; fundamentally, the technique was the same. The witness testified that the power steering pump bracket was also visually inspected for significant defects by the assembly line worker and more importantly, that Ford relies upon the "dimension-arrived-at" theory in the "vast majority of the assembly things that Ford does at their plant." On their negligence cause of action, plaintiffs had the burden of proving that Ford was negligent in failing to uncover the defect in the power steering pump bracket and the questioned evidence was being introduced on that cause of action as part of plaintiffs' case in chief. Evidence that visual inspection on the assembly line and reliance upon the "dimension-arrived-at" theory failed to uncover the defect in the Pitman arm-sector shaft assembly was thus relevant to show that Ford's method of inspecting and checking for defects was inadequate. Although there was evidence that the functional test (running the car for 15 minutes) was used as an additional safeguard against misalignment in the power steering pump pulley, there was evidence that while running the car for 15 minutes would uncover significant misalignment, a misalignment of a lesser degree would not be revealed in that brief testing period. The evidence is clear that Ford relied primarily on the "dimension-arrived-at" theory and visual inspection on the assembly line to uncover defects. The evidence in question was, therefore, relevant.
"Except as otherwise provided by statute, all relevant evidence is admissible." (Evid. Code, § 351.) The general test for relevancy is whether the evidence tends logically, naturally, and by reasonable inference to establish the fact in issue. (People v. Jones, 42 Cal.2d 219, 222 [266 P.2d 38]; People v. Warner, 270 Cal. App.2d 900, 907 [76 Cal. Rptr. 160].) Since relevancy depends on the nature of the particular issue involved and the facts and circumstances of each case, wide discretion must be vested in the trial judge in determining whether the evidence should be received. (Spolter v. Four-Wheel Brake Serv. Co., 99 Cal. App.2d 690, 699 [222 P.2d 307].)
In the case at bench, Ford's counsel virtually conceded relevancy of the questioned evidence but argued that the court should exercise its discretion under Evidence Code section 352 and exclude the evidence because of its prejudicial effect. Ford's counsel stated: "I think it is *865 discretionary with the Court, at this point, and whether the prejudicial aspects of it would outweigh any beneficial aspects of it, I think in this case where they are saying this would definitely cause an accident in the future, is what he seems to be saying, is completely prejudicial to our side of the case." The judge ultimately overruled defendant's objection stating: "I think it is somewhat remote but it does tend to show the inspection and lack of inspection on the steering system." In my opinion the court's ruling did not constitute an abuse of discretion.
Marocco v. Ford Motor Co., 7 Cal. App.3d 84 [86 Cal. Rptr. 526], relied upon by Ford and cited by the majority is not controlling. The issue there was whether Ford Motor Company's report to a congressional committee listing corrective actions taken by the company over a span of years to remedy various defects in automobiles manufactured by it was admissible. The trial court permitted plaintiff to introduce that portion of the report which listed 10 corrective actions taken by Ford with respect to the particular year model of the vehicle involved in the action. None of those corrections involved the claimed defect in the transmission selector mechanism which was the basis of plaintiff's lawsuit. The reviewing court held that the evidence pertaining to other defects was inadmissible to prove a defect in the transmission selector system or to prove that the manufacturer had knowledge or notice of the claimed defect. Here, unlike Marocco, the defect pertained not only to the specific vehicle involved in the lawsuit but concerned a component of the steering mechanism. More importantly, the evidence was offered, not to prove that the power steering pump bracket was defective, but to show that Ford negligently performed its duty to inspect for defects.
A petition for a rehearing was denied August 3, 1977, and appellant's petition for a hearing by the Supreme Court was denied October 20, 1977.
NOTES
[1] Plaintiffs did not argue this theory of admissibility in the trial court, nor in their brief on appeal. Neither was it reflected in their argument to the jury. On the contrary, all such arguments espoused the simple, albeit erroneous, theory that it is permissible to infer one negligent inspection from another negligent inspection.
[2] Mr. Valant testified: "I would say we do not inspect that bracket after it gets to our plant, that is true. But we do make functional tests and if the bracket is significantly enough out of align to cause any trouble, that functional test would reveal it."
[3] With respect to the Pitman arm-sector shaft connection. Mr. Valant, through whom plaintiffs undertook to prove Ford's testing procedures, testified: "Well, that is a different matter.... [T]he steering gear is assembled, put on back at the head of the chassis line, that is inspected, that is visually inspected by the  when it comes down the chassis line."
[4] Evidence Code section 352 reads: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."
[5] Plaintiffs' counsel argued: "If they don't look for this [the Pitman arm-sector shaft junction defect], they are not going to look for anything because everybody agreed that is the one link between your steering wheel and the wheels. You lose that and you have no steering at all. And they didn't even, in spite of the fact that this was improperly assembled and assembled in such a way, and you can see it when you  if you take it in the jury room, you hold it, you can see that cut goes right around all the splines....[¶] And nobody says that is not true. Because they know it is true. They know deep in their hearts how badly they assembled these things. They assembled them so badly that one has to come to the conclusion that they find it cheaper to pay judgments than to pay people to properly inspect and properly assemble those parts." Ford did not object or seek an admonition with respect to this argument.
[6] The verdict form was as follows:

"(1) We, the jury in the above-entitled action, find for the Plaintiff or Plaintiffs named below and assess the amount of damages of each as set opposite each name, as follows:

 "PLAINTIFF: DAMAGES:
 "Carol Ann Brokopp $10,000.00
 "Robert William Brokopp $3,000,000.00
 "As to such said Plaintiff, our findings and award of damages are against
 the
 Defendant or Defendants named below:
 "Ford Motor Co., Inc. $2,007,500.00
 "Sunset Ford, Inc. $1,002,500.00
 "(2) We further find for the Defendant or Defendants named below:
 "Recreational Vans Inc. 
 against the Plaintiff or Plaintiffs named below:
 "Carol Ann Brokopp
 "Robert William Brokopp
 "Dated this 26th day of June, 1975.
 "[s] Royee S. Underwood
 "Foreman"

[1] The law is well settled that when an article is such that it is reasonably certain that if it is negligently manufactured or designed it will place life or limb in peril the manufacturer is chargeable with negligence if the defective condition could have been disclosed by reasonable inspection and tests and such inspection and tests are not made. (Pike v. Frank G. Hough Co., 2 Cal.3d 465, 470 [85 Cal. Rptr. 629, 467 P.2d 229]; Sheward v. Virtue, 20 Cal.2d 410, 414 [126 P.2d 345]; Putensen v. Clay Adams, Inc., 12 Cal. App.3d 1062, 1078 [91 Cal. Rptr. 319]: Rest.2d Torts, § 395.)