Filed 5/17/13  Ameri v. JP Morgan Chase Bank CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| IRAJ AMERI,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>JP MORGAN CHASE BANK, N.A.,<br><br>Defendant and Respondent. | D060593<br><br><br>(Super. Ct. No. 37-2009-00103174-CU-BC-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Steven R. Denton, Judge.  Affirmed.

Elizabeth E. Comeau and Philip L. Gagnon, Jr. for Plaintiff and Appellant.

AlvaradoSmith, Theodore E. Bacon and Thierry R. Montoya for Defendant and Respondent.

Iraj Ameri obtained a residential construction loan from Washington Mutual Bank (WMB).  Subsequently, JP Morgan Chase Bank, N.A. (Chase) acquired Ameri's loan.

After Ameri defaulted on various provisions of the loan agreement, Chase instituted foreclosure proceedings. Ameri sued Chase for breach of contract. As tried under his third amended complaint, the lawsuit also included causes of action for breach of the implied covenant of good faith and fair dealing, breach of the duty of commercial reasonableness, wrongful foreclosure and financial elder abuse. Chase moved for nonsuit following Ameri's presentation of evidence. The trial court granted the motion and entered judgment in Chase's favor.

Ameri appeals, challenging a number of the trial court's evidentiary rulings and claiming he presented sufficient evidence to avoid a nonsuit. Ameri also asserts the court erred by forcing him to abandon his cause of action for unjust enrichment. We affirm.

FACTUAL & PROCEDURAL HISTORY

On August 30, 2007, Ameri entered into an agreement with WMB to obtain a $3.42 million residential construction loan secured by a deed of trust recorded against the property located at 460 Country Club Lane in Coronado. Under the loan agreement, WMB agreed to advance monies to Ameri to finance the purchase of the property, demolish the existing residence on the property and to construct a custom home on the property within 12 months. The loan agreement provided for a scheduled completion date of August 31, 2008. The loan agreement also included a "time is of the essence" provision.

Under the agreement, the construction loan would convert to a conventional loan with amortization through regular monthly payments of principal and interest after the residence was built. If the construction was not completed by August 31, 2008, or an

2

extended date agreed to by WMB in writing, the bank could declare the construction loan immediately due and payable. The loan agreement identified the failure to complete construction before the scheduled completion date as a default. As long as any default remained, the lender had no obligation to disburse funds under the loan agreement. Among other things, Ameri agreed to keep the property "free and clear of any and all liens other than the security interest(s) of Lender. . . ."

After escrow closed, WMB began releasing construction funds to Ameri's general contractor, which were used to obtain a demolition permit and hire a crew to demolish the existing structure. The demolition was completed in a timely fashion.

However, WMB stopped disbursing construction funds after it discovered a competing deed of trust had been recorded on the property by the sellers because Ameri had defaulted on a $45,000 promissory note.[1] In February 2008, WMB placed Ameri's construction loan in "workout" status, which effectively froze disbursement of funds until the issue was resolved. In April 2008, WMB formally informed Ameri he was in default of the construction loan agreement because he had agreed to keep the property free of liens and had not done so. Further, WMB said it had no obligation to disburse funds as long as any default existed. WMB told Ameri it would not disburse any further construction funds until the sellers' lien was removed from the title on the property.

_____

[1] Ameri had signed the $45,000 promissory note and the deed of trust to the sellers one day before he signed the WMB loan agreement. The sellers recorded the deed of trust on September 4, 2007. In January 2008, the sellers filed a notice of default after Ameri did not make payments due under the note. Ameri claimed he did not know the sellers had recorded the deed of trust until he received the notice of default.

It took Ameri and his contractor several months to get the sellers of the property to remove the lien. WMB agreed to disburse $15,600 to Ameri, through an architectural budget change order, to pay the sellers a compromised amount of $15,000 to reconvey the sellers' deed of trust to Ameri plus $600 in attorney fees.[2] After the sellers were paid in June 2008 and reconveyed the deed of trust to Ameri, WMB moved Ameri's loan from "workout" to regular status.

In July 2008, WMB informed Ameri that he was behind in his interest payments under the construction loan. When the construction loan closed, an interest reserve account in the amount of $159,030 had been set up to pay for the interest payments as they became due.[3] The reserve account had a remaining balance of $4,358.53, which was insufficient to pay the $16,617.86 interest payment due on August 1. Ameri said he did not make interest payments to cure the default because WMB did not assure him that it would release the loan funds.

Also in July 2008, Ameri asked WMB to extend the scheduled completion date on the construction loan. In a July 28 letter, WMB said it would grant a three-month extension to December 1, 2008, for a fee of $25,650. Ameri believed a three-month extension would not be adequate, and he also questioned the proposed extension fee of $25,650. Ameri did not accept WMB's three-month extension offer.

---

[2] WMB agreed to this disbursement as a one-time exception to releasing funds while the loan was in "workout" status.

[3] The $159,030 figure was based on the 12-month term of the construction loan agreement.

On August 8, 2008, Ameri and his contractor asked WMB to put $70,000 in the interest reserve account, which they justified by pointing to construction plan changes eliminating the planned basement garage and the pool/jacuzzi. These changes were necessary because the City of Coronado would not approve a basement garage. On August 13, WMB placed Ameri's loan in the "workout" category to consider that request as well as the proposed change in the scope of the construction plan. WMB informed Ameri that it needed to review the new building plans for purposes of obtaining a new appraisal. Ameri told WMB he did not have money to pay for the new plans. On August 26, 2008, WMB made its second one-time exception to its "workout" policy and disbursed $8,975 to pay for the new plans. (See fn. 2, *ante*.)

On August 31, 2008, the construction loan expired. By this date, the only improvement completed at 460 Country Club Lane was the demolition of the existing structure. Ameri had not obtained a completed set of approved plans or building permits for the construction of the residence.

On September 25, 2008, WMB was closed by the Office of Thrift Supervision, and the Federal Deposit Insurance Corporation (FDIC) was appointed the receiver. The FDIC, acting as receiver, permitted Chase to acquire certain assets of WMB through a purchase and assumption agreement (PAA). Pursuant to the PAA, which was dated September 25, 2008, Chase purchased some of WMB's assets, including Ameri's construction loan, and assumed the servicing responsibilities for Ameri's loan, which continued to be in "workout" status.

5

In October 2008, Ameri contacted Christine Symanski, a Chase employee who was assigned a fact-finding role regarding construction loans that were either delinquent or going into foreclosure. Symanski's job was to obtain new information from borrowers in this situation to determine whether Chase should continue with their loans or proceed with foreclosure. Specifically, Symanski requested Ameri to submit his 2006 and 2007 personal and business tax returns and the two most recent months of asset information. On November 17, 2008, Symanski e-mailed Ameri that the bank would "not move forward with releasing funds for [the] construction loan until requested financial information is provided and account [was] brought current."[4]

On November 14, 2008, Chase sent Ameri a certified breach letter stating the loan's maturity date had expired on September 1, 2008. The letter also noted that Ameri's interest payments on the loan were four months past due. On November 25, 2008, Chase instituted foreclosure proceedings. On December 18, 2008, Chase recorded a notice of default and election to sell under the deed of trust.

Also that month, Ameri's attorney demanded Chase withdraw its notice of default and suggested the matter could be worked out if funds were released and the loan was amended to a completion date of November 19, 2009. The attorney's letter also stated Ameri would pay the accrued interest due on the loan out of his separate funds. The attorney asserted: (1) the building permits could be obtained within 30 days; (2) time to complete the construction would be approximately 10 months from permitting; (3) a

---

[4]    The appraisal for Ameri's project with the new plans was lower than the original appraisal upon which the construction loan was based.

certificate of occupancy could therefore be obtained on or before November 15, 2009; and (4) construction could be completed with the amount of money left in the unfunded portion of the loan, which was approximately $1.1 million.

Chase began a risk review process in response to Ameri's request for the loan extension. On March 9, 2009, a Chase employee started gathering information about the loan and entered it on a risk review worksheet to "show the current state of the construction loan." The worksheet was sent to the senior risk committee, which on March 16, 2009, denied Ameri's request for an extension and recommended the bank continue with foreclosure. Chase's denial of the extension request was based on the following factors: Ameri had not built anything on the property, Ameri had not obtained a building permit, Ameri had managed to complete only 4 percent of the loan's construction scheduled activities, and Ameri had allowed a competing lien to cloud title. Chase concluded there was no reasonable basis to presume Ameri would build anything at any reasonable time in the future.

Chase foreclosed on the property at a public auction on April 28, 2009, in which it bought the property for $984,000. On May 1, 2009, the substitute trustee recorded a trustee's deed upon sale.

In granting the nonsuit, the trial court found that Chase was not obligated to grant Ameri's loan extension request given the lack of approved construction plans and building permits. The court also ruled Ameri was in material breach of the loan agreement by failing to start and complete construction within the required times; not making timely interest payments, as required; and allowing a competing lien to be

7

recorded against the property. "JP Morgan Chase would have been within its legal rights to declare breach of the agreement and accelerate the loan and institute foreclosure proceedings based on any of these material breaches," the court said.

## DISCUSSION

### I. *Evidentiary Issues*

Ameri contends the trial court erred by (1) allowing Chase to present the testimony of Daniel C. Steenerson, the seller of the Country Club Lane property; (2) allowing Stacy Teasdale, a Chase employee who prepared the risk review worksheet, to give expert opinion derived from inadmissible multiple hearsay; and (3) not allowing Ameri to testify about the value of his residence in Carmel Valley. We consider these claims in seriatim.

*Steenerson Testimony*

Ameri filed a motion to exclude the testimony of Steenerson on the grounds it was irrelevant to his claim against Chase and prejudicial.[5] Ameri's counsel argued the issue of the Steenerson trust deed was resolved before Chase entered the picture and had nothing to do with Chase's decisionmaking. The trial court denied the motion, finding the Steenerson trust deed had direct relevance to the lawsuit because the entire history of the loan agreement was going to be explored and was potentially relevant for impeachment. Steenerson was allowed to testify as a defense witness during the presentation of plaintiff's case-in-chief as an accommodation to the witness.

---

5     Ameri's motion was entitled "Motion to Preclude the Red Herring Steenerson-Cured-Junior Lien Issue from being Presented to the Jury."

On appeal, Ameri repeatedly argues the Steenerson lien was irrelevant because Chase did not rely on it when denying his request for a 10-month construction extension and proceeding with foreclosure. We disagree.

There were numerous factors supporting Chase's decision, including the Steenerson lien, as shown on the risk review worksheet. The worksheet noted the title was "clouded, there is a second [deed of trust] of [$]50,000 executed a day before [WMB] loan, but recorded 18 days after [WMB deed of trust] recording." The preparer of the worksheet testified the cloud on title was "a huge red flag." "[W]ith construction loans, you're not allowed to have a second mortgage or second deed of trust on the title. We require a clean title, period." The preparer also said: "If we give them that opportunity to clean up that second deed of trust, a lot of times they clean it up, we pull clean title and they go right back and get another one recorded, so it is a huge red flag for us."

The existence of the recorded Steenerson deed of trust was a breach/default by Ameri. Further, Ameri's argument that it was taken care of before Chase became involved is unavailing because the default was contractually preserved. The construction loan agreement specifically provided: "Failure or delay by Lender to exercise or enforce a right, power, or remedy under this Construction Loan Agreement shall not constitute a waiver of such right, power or remedy under the same." Thus, under the agreement, Chase could raise any default, at any time, as the reason for foreclosure. Chase did not waive the default caused by the Steenerson trust deed and properly considered it in evaluating the extension request and proceeding with foreclosure.

9

Ameri also complains the trial court erred by allowing Chase to present its witness Steenerson out of order and before establishing the preliminary fact making the testimony relevant—namely, that Chase relied on the Steenerson lien issue to foreclose. Ameri fails to demonstrate error.

"The [trial] court in its discretion shall regulate the order of proof." (Evid. Code, § 320.) "Motions for . . . calling witnesses out of order[] are largely in the discretion of the trial court. It must be made to appear very clearly that such discretion has been abused before [the appellate court] can reverse the trial court's action." (*Estate of Lefranc* (1950) 95 Cal.App.2d 885, 887-888.) We find no abuse of discretion in allowing Steenerson to testify out of order as an accommodation to him.

Ameri's argument about the failure to establish the preliminary fact supporting Steenerson's testimony is not well taken. The portions of the Evidence Code concerning preliminary determinations on the admissibility of evidence are contained in division 3, article 2, at sections 400 et seq. (See particularly Evid. Code, §§ 402-405.) However, Ameri ignores Evidence Code section 406, which provides: "This article does not limit the right of a party to introduce before the trier of fact evidence relevant to weight or credibility." Before Steenerson was called, Ameri testified he never owed Steenerson any money, Steenerson—not he—had created the problems with his loan, the Steenersons were "trying to cheat me," and the recording of Steenerson's deed of trust was a dishonest transaction. Steenerson's testimony was intended, among other things, to impeach Ameri's credibility. "A party may introduce various types of evidence either impeaching or supporting a witness's credibility [Evid. Code, §§ 780, 785], or evidence relevant to

10

weight and credibility [Evid. Code, § 406]." (3 Witkin, Cal. Evidence (5th ed. 2012) Presentation at Trial, § 100, p. 154.) Since Steenerson's impeaching testimony was admissible under Evidence Code section 406, there was no need to make a preliminary fact determination.

There was no error.

*Teasdale Testimony*

Ameri contends Teasdale improperly (1) included expert opinions by her coworker, Randy Chanadet,[6] who provided information and analysis concerning the property value for input on the risk review worksheet, as well as her own expert opinions, and (2) included multiple layers of hearsay. Ameri also contends it was error to admit into evidence exhibit 122, the risk review worksheet. These contentions are without merit.

Ameri's counsel called Teasdale as a hostile witness pursuant to Evidence Code section 776. Teasdale prepared the risk review worksheet, which was the basis for Chase's decision to deny Ameri's request for a contract extension. Teasdale's function was to gather information about the loan and enter it on the worksheet form, which was designed to "show the current state of the construction loan." She was not part of the decision-making process on whether to grant the extension. Further, Teasdale had no independent recollection of working on Ameri's file.

---

6     At the time, Chanadet, a California appraiser, and Teasdale were working in Chase's loss mitigation department at the bank's Denver National Construction Center.

Notwithstanding Ameri's arguments, Teasdale did not testify as an expert witness and did not offer expert opinion testimony. Moreover, Ameri's citations to the record to show Teasdale provided improper expert opinions—about (1) how the decisionmakers would assess the worksheet information, (2) the significance of the property's location near a naval air station, and (3) whether the appraised value was too high—did not elicit an objection based on improper opinion evidence from Ameri's counsel.[7] In order to preserve a claim of evidentiary error for appellate review, an appellant must make a contemporaneous and specific objection in the trial court. (Evid. Code, § 353, subd. (a).) Ameri's failure to object to this evidence forfeits his appellate claim the evidence was improperly admitted as opinion evidence. (3 Witkin, Cal. Evidence, *supra*, Presentation At Trial, § 383, p. 535.)

Ameri also complains that Teasdale's testimony included "generalizations and speculations of the conduct or situation of other borrowers that have nothing to do with this case." However, the testimony cited by Ameri to back up this claim was not expert opinion testimony. Rather, it was properly admitted lay opinion testimony. (Evid. Code, § 800.)[8]

---

[7] Ameri's counsel objected on foundational grounds to a question about how Chase's decisionmakers would treat information concerning the percentage of construction line items in the plan that had been completed. Chase's counsel then asked Teasdale a question to establish the foundation.

[8] Evidence Code section 800 provides: "If a witness is not testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is permitted by law, including but not limited to an opinion that is: [¶] (a) Rationally based on the perception of the witness; and [¶] (b) Helpful to a clear understanding of his testimony."

As Ameri correctly notes, at the time Teasdale prepared the risk review worksheet for Ameri's extension request, she had been preparing such worksheets for Chase for less than a month. However, Teasdale previously had worked in the banking and mortgage industry for 10 years, including working as a mortgage loan officer for new construction loans.

Lay opinion testimony is admissible if it is based on the witness's own perceptions and personal observations and is helpful to understanding the witness's testimony. (Evid. Code, § 800; *People v. McAlpin* (1991) 53 Cal.3d 1289, 1306-1307 & fn. 12.) Teasdale's testimony at issue in this complaint was based on her long experience in the banking and mortgage industry and was helpful in describing how banks deal with construction loans. Such testimony does not call for an expert witness because Teasdale was describing her work activities and her personal experience. Whether to admit lay witness opinion testimony rests largely in the trial court's discretion. (*Osborn v. Mission Ready Mix* (1990) 224 Cal.App.3d 104, 112.) Appellate courts give broad deference to the trial court's decision to admit lay opinion testimony that is subject to cross-examination. (*Ibid.*) There was no abuse of discretion here.

Ameri also complains the expert opinions of Chandalet, who did not appear at trial, were improperly admitted through Teasdale's testimony. However, all of Ameri's citations to the record concerning this issue took place during his counsel's questioning of Teasdale. Again, the absence of proper objections operates as a waiver or forfeiture of this issue on appeal. (Evid. Code, § 353, subd. (a).)

13

The real crux of Ameri's contentions concerning Teasdale's testimony is the admissibility of the risk review worksheet. Bank records are admissible as business records. (*Greenspan v. LADT, LLC* (2010) 191 Cal.App.4th 486, 524.) We find the worksheet was properly admitted under Evidence Code section 1271, the business records exception to the hearsay rule.[9]

It is undisputed Teasdale's risk review worksheet was prepared by Teasdale in the regular course of Chase's consideration of loan modification requests. (Evid. Code, § 1271, subd. (a).) Moreover, it is undisputed Teasdale entered the information onto the worksheet during the week of May 9, 2009, after receiving the request for an extension of the scheduled completion date for the loan, and the senior risk review committee denied the request on May 16 after reviewing the worksheet. (Evid. Code, § 1271, subd. (b).) In her testimony, Teasdale identified the worksheet and described how it was prepared. (Evid. Code, § 1271, subd. (c).) Teasdale's testimony provided substantial evidence to the trustworthiness of the sources of information and the procedures employed in preparing the report. (Evid. Code, § 1271, subd. (d).)

"The key to establishing the admissibility of a document made in the regular course of business is proof that the person who wrote the information or provided it had

---

9    Section 1271 provides: "Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered to prove the act, condition, or event if: [¶] (a) The writing was made in the regular course of a business; [¶] (b) The writing was made at or near the time of the act, condition, or event; [¶] (c) The custodian or other qualified witness testifies to its identity and the mode of its preparation; and [¶] (d) The sources of information and method and time of preparation were such as to indicate its trustworthiness."

14

knowledge of the facts from personal observation." (*Jazayeri v. Mao* (2009) 174 Cal.App.4th 301, 322.) "The witness need not have been present at every transaction to establish the business records exception; he or she need only be familiar with the procedures followed, which [Teasdale] clearly was. (*Ibid.*)

To the extent Ameri objects to the introduction of the worksheet because Chandalet provided information and analysis about the property for the worksheet and was not available as a witness, there was no error. From Teasdale's testimony, it could reasonably be inferred that the worksheet was prepared in the usual manner and regular course of Chase's business. """In the case of the conduct of the business and affairs of an establishment, it is presumed that the regular course of business of such establishment is followed [citation] and the books and records of an establishment truly reflect the facts set forth in such books.""" (*County of Sonoma v. Grant W.* (1986) 187 Cal.App.3d 1439, 1451.) The purpose of the business records exception is to eliminate the necessity of calling each witness involved in preparation of the record, and to substitute the record of the transaction or event. (*Loper v. Morrison* (1944) 23 Cal.2d 600, 608-609; *County of Sonoma v. Grant W.*, *supra*, at p. 1451.)

Moreover, the evidentiary value of the risk review worksheet was that it was a document within Chase's records indicating the reasons for its action—denying Ameri's extension request. Admission of the worksheet did not necessarily show the truth of its individual components; rather, it showed Chase conducted a review and was offered to determine whether Chase made an arbitrary decision.

15

Determining whether a proper foundation has been laid for the admission of business records under Evidence Code section 1271 is within the trial court's discretion and "will not be disturbed on appeal absent a showing of abuse." (*County of Sonoma v. Grant W.*, *supra*, 187 Cal.App.3d at p. 1450; *Aguimatang v. Cal. State Lottery* (1991) 234 Cal.App.3d 769, 797.) The trial court did not abuse its discretion in admitting exhibit 122, the risk review worksheet.

*Limitation on Ameri's Testimony*

Ameri contends the trial court erred by not allowing him to testify about the value of his residence in Carmel Valley. The contention is without merit.

On direct examination, Ameri's counsel asked him the December 2008 value of his Carmel Valley residence. The trial court sustained Chase's objection to the question on relevancy grounds.

In a sidebar discussion, Ameri's counsel explained he wanted to explore the equity Ameri had in this Carmel Valley home to show his client could have supplied additional security for the construction loan. Counsel further argued that if Chase were actually concerned about the viability of the construction loan, it would have considered Ameri's ability to provide additional security. The court found Chase did not have a contractual duty at that point in time to inquire about other assets owned by Ameri.

Evidence Code section 351 provides: "Except as otherwise provided by statute, all relevant evidence is admissible." "'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the

16

determination of the action." (Evid. Code, § 210.) An appellate court examines the exclusion of evidence on relevancy grounds for abuse of discretion. (*City of Ripon v. Sweetin* (2002) 100 Cal.App.4th 887, 900.)

By December 2008 the property was in foreclosure. As a result of Ameri's counsel's extension request letter, Chase engaged in a risk review to determine at that point in time whether the loan could be made viable or it was too risky to attempt to do so. Chase looked at factors, such as the lack of a building permit and the failure to start building on the property after more than one year, and concluded based on this track record that it would be too risky. Given the property was in foreclosure at the time, Chase was not required to look at Ameri's other assets as part of its risk review. The value of Ameri's other assets, therefore, was not relevant. "No evidence is admissible except relevant evidence." (Evid. Code, § 350; *Brokopp v. Ford Motor Co.* (1977) 71 Cal.App.3d 841, 853.)

Moreover, even if evidence of Ameri's other assets was relevant, any error was harmless. "In civil cases, a miscarriage of justice should be declared only when the reviewing court, after an examination of the entire cause, including the evidence, is of the opinion that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Huffman v. Interstate Brands Corp.* (2004) 121 Cal.App.4th 679, 692.) Not permitting Ameri to testify about the value of his Carmel Valley residence did not result in a miscarriage of justice.

## II. *Nonsuit Properly Granted*

Ameri contends the trial court erred when it granted Chase's motion for a nonsuit. The contention is without merit.

A defendant's motion for judgment of nonsuit "is the modern equivalent of a demurrer to the evidence; it concedes the truth of the facts proved [by the plaintiff], but denies that they, as a matter of law, sustain the plaintiff's case." (7 Witkin, Cal. Procedure (5th ed. 2008) Trial, § 406, p. 478.) "A defendant is entitled to a nonsuit if the trial court determines that, as a matter of law, the evidence presented by plaintiff is insufficient to permit a jury to find in his favor." (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 291.) "A trial court may grant a nonsuit only when, disregarding conflicting evidence, viewing the record in the light most favorable to the plaintiff and indulging in every legitimate inference which may be drawn from the evidence, it determines there is no substantial evidence to support a judgment in the plaintiff's favor." (*Edwards v. Centex Real Estate Corp.* (1997) 53 Cal.App.4th 15, 27.)

In reviewing the trial court's ruling, we independently view the evidence most favorably to plaintiff "'resolving all presumptions, inferences and doubts in [his] favor.'" (*Carson v. Facilities Development Co.* (1984) 36 Cal.3d 830, 839.) We will uphold the judgment for respondent only if there is no substantial evidence to support a judgment for appellant. (*Edwards v. Centex Real Estate Corp.*, *supra*, 53 Cal.App.4th 15 at p. 28.) "'Although a judgment of nonsuit must not be reversed if plaintiff's proof raises nothing more than speculation, suspicion, or conjecture, reversal is warranted if there is "some substance to plaintiff's evidence upon which reasonable minds could differ. . . ."'

18

[Citation.] In other words, '[i]f there is substantial evidence to support [the plaintiff]'s claim, *and* the state of the law also supports that claim, we must reverse the judgment.'" (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1124-1125.)

Ameri claims Chase breached the loan agreement by not granting the extension request and by foreclosing on the property. The elements of breach of contract are "(1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff." (*Careau & Co. v. Security Pacific Business Credit, Inc.* (1990) 222 Cal.App.3d 1371, 1388.) In an action upon a contract, a plaintiff must prove either performance or a valid excuse for nonperformance. (*Nesson v. Northern Inyo County Local Hosp. Dist.* (2012) 204 Cal.App.4th 65, 87.) "The *wrongful*, i.e., the unjustified or unexcused, failure to perform a contract is a *breach*." (1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 847, p. 935.) "[I]t is elementary that one party to a contract cannot compel another to perform while he himself is in default." (*Lewis Publishing Co. v. Henderson* (1930) 103 Cal.App. 425, 429.)

It is undisputed Ameri, at a minimum, committed the following material breaches of the loan agreement: failed to obtain approved plans and building permits; failed to complete construction within the scheduled completion date; and failed to pay interest on

time as due starting August 1, 2008.[10]  Further, there was no evidence that either WMB or Chase played a role in any of these breaches by Ameri.

Ameri's complaint that his construction efforts were stymied because loan disbursements were suspended for several months is unavailing.  WMB was contractually entitled to suspend disbursements until Ameri cleared the Steenerson lien.  Moreover, neither WMB nor Chase was involved with the City of Coronado's veto of a basement on the property, which necessitated a change of plans.  Ameri may have been a victim of some unfortunate circumstances—some of his own making and some not—but neither lender was to blame for these circumstances.  "A commercial lender is not to be regarded as the guarantor of a borrower's success and is not liable for the hardships which may befall a borrower.  [Citation.] . . . [I]n this state a commercial lender is privileged to pursue its own economic interests and may properly assert its contractual rights." (*Sierra-Bay Fed. Land Bank Assn. v. Superior Court* (1991) 227 Cal.App.3d 318, 334-335.)

Ameri's breach of contract claim fails as a matter of law because he did not demonstrate that he performed under the contract or was excused from performing; he

---

10     The trial court also found, among other things, Ameri breached the loan agreement by granting a security interest in the property to the Steenersons, who recorded their deed of trust and established a lien on the property.  We agree this was a material breach. Under the loan agreement, Ameri promised the property was unencumbered and free of all liens.  We reject Ameri's arguments that because the breach was cured and no longer a factor when Chase became involved it was not a material breach.  Under the loan agreement (§§ 9, 13), the lender had the right to raise any default at any time.  (See *Storek & Storek, Inc. v. Citicorp Real Estate Inc.* (2002) 100 Cal.App.4th 44, 51, fn. 5, 58, fn. 11.)

failed to establish all of the elements of a breach of contract by his lenders. (*Hamilton v. Greenwich Investors XXVI, LLC* (2011) 195 Cal.App.4th 1602, 1614.)

Ameri's cause of action for breach of the implied covenant of good faith and fair dealing also failed as a matter of law. Under California law, every contract imposes upon each party a duty of good faith and fair dealing in the performance of the contract such that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 36.) Outside of the insurance context, liability for breach of the implied covenant of good faith and fair dealing sounds solely in contract, not in tort. (*Cates Construction Inc. v. Talbot Partners* (1999) 21 Cal.4th 28, 43-44.)

The implied covenant of good faith and fair dealing is intended to prevent either party to a contract from unfairly frustrating the other party's right to receive the benefits of the contract. (*Cates Construction Inc. v. Talbot Partners, supra,* 21 Cal.4th at p. 43.) However, our Supreme Court has clarified that an implied covenant of good faith and fair dealing cannot contradict the express terms of a contract. (*Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 373 [scope of conduct prohibited by implied covenant is limited, and "circumscribed by the purposes and express terms of the contract"].) A court may not imply a covenant of good faith and fair dealing that contradicts the express terms of an agreement. (*Storek & Storek, Inc. v. Citicorp Real Estate, Inc.*, *supra*, 100 Cal.App.4th at p. 55.) Thus, if the contract gives the right to one party to do what it did, there can be no breach of the implied covenant. (*Ibid*.)

21

Ameri claims Chase breached the implied covenant by not modifying the loan—

i.e., not extending the scheduled completion date—and by foreclosing on the property.

As to Ameri's proposed loan modification, the loan agreement provided:

> "If the Residence or Improvements are not completed and the final advance of the Loan has not occurred prior to the Scheduled Completion Date or any extended Scheduled Completion Date, Lender shall have the right to then or thereafter declare the Loan immediately due and payable.  Without limiting the foregoing, Borrower may request and Lender, in its sole discretion, may grant an extension of the Scheduled Completion Date pursuant to the terms of the Construction Loan Addendum to Note.  Any such extension shall be granted pursuant to terms and conditions acceptable to Lender in its sole and absolute discretion including, but not limited to, Borrower's payment of an extension fee and execution of such instruments as the Lender may require.  Any extensions of the Scheduled Completion Date granted by Lender hereunder shall not require Lender to grant any further such extension."[11]

---

[11]     The pertinent provision in the construction loan addendum to note reads:  "Failure to complete construction . . . prior to the Scheduled Completion Date, shall constitute an event of default hereunder, under the Security Instrument and under the Construction Loan Agreement. . . .  [O]n a one-time basis only, at Borrower's request, Lender in its sole discretion may, but shall not be required to, approve an extension of the Scheduled Completion Date of up to ninety (90) days to facilitate the completion of construction.  If Borrower desires to request such an extension, Borrower shall deliver a written extension request to the Lender no less than ten (10) days prior to the Scheduled Completion Date.  Any such extension shall be subject to the following conditions: (i) Borrower must execute a Modification Agreement and such other documentation as Lender may require; (ii) Borrower must pay to Lender an extension fee equal to [one-fourth percent] of the face loan amount on the Note for each 30-day period or portion thereof, for which the extension has been approved, as well as any other costs and expenses associated with the extension; (iii) Borrower must cause Contractor and/or other third parties to execute such additional documentation as Lender may require; and (iv) Borrower must obtain for the benefit of Lender, at Borrower's sole expense, such endorsements to Lender's Policy of Title Insurance as Lender may require."

Under the loan agreement documents, Chase had sole discretion to decide whether to extend the scheduled completion date. When a contract expressly authorizes a party to take certain actions, the right to exercise that right is unfettered by the implied covenant of good faith and fair dealing. (*Carma Developers (Cal.), Inc v. Marathon Development California, Inc.*, *supra*, 2 Cal.4th at p. 374.) Rather, the exercise of discretion by the party is judged by the standard of objective reasonableness. (*Storek & Storek, Inc. v. Citicorp Real Estate, Inc.*, *supra*, 100 Cal.App.4th at p. 60.) Chase's decision in May 2009 to deny Ameri's request for a 10-month extension passes *any* objective reasonable standard. Not only had there been no construction on the property in 18 months, Ameri had not secured approved plans or any building permits. The contractor's estimate that the construction could be completed within 10 months after the building permits were obtained was speculative at best. Moreover, Ameri, who had committed numerous breaches of the loan agreement, rejected WMB's offer of a three-month extension of the completion date, which was the maximum extension time period under the loan documents. (See fn. 11, *ante*.) Chase also could reasonably consider Ameri's breach involving the Steenerson lien. Although Ameri cured this breach, the banking industry considers any cloud on title a red flag regardless of whether the cloud is removed.

Ameri's claim that Chase breached the implied covenant of good faith and fair dealing by foreclosing on the property is also misplaced. A lender does not owe a duty of good faith to forbear from foreclosure when the borrower is in default, regardless of the hardship that strict enforcement may impose. (*Price v. Wells Fargo Bank* (1989) 213

23

Cal.App.3d 465, 479, overruled on other grounds in *Riverisland Cold Storage, Inc. v. Fresno-Madera Production Credit Assn.* (2013) 55 Cal.4th 1169, 1176-1182.)

Ameri, who was 67 when he entered into the loan agreement with WMB, could not—as a matter of law—prevail on his cause of action for financial elder abuse under Welfare and Institutions Code section 15600 et seq. because he did not present evidence of fraud by Chase.

Welfare and Institutions Code section 15610.30, subdivision (a)(1) provides: "'Financial abuse' of an elder . . . adult occurs when a person or entity does any of the following: [¶] (1) Takes, secretes, appropriates, obtains, or retains real or personal property of an elder . . . adult for a wrongful use or with intent to defraud, or both."[12]

Ameri argues he demonstrated the fraud element by showing Chase's rush to foreclose without engaging in a "workout" process and Chase's risk review was effectively a sham because it did not consider positive information about Ameri's credit score and his equity in another property. Ameri also refers to testimony by a Chase employee that Chase was getting out of the construction lending business a point that was not communicated to him. We are not persuaded.

Regardless of whether Chase used the term "workout," the evidence showed that Chase employee Symanski attempted to work with Ameri to see if the loan could be resuscitated. However, that process was frustrated because Ameri did not supply requested financial information. As to the risk review, which included Ameri's high

---

12      An elder is defined as "any person residing in this state, 65 years of age or older." (Welf. & Inst. Code, § 15610.27.)

24

credit score, we disagree with Ameri's characterization. In the face of no approved plans, no building permits and nothing having been built in one and one-half years, inclusion of Ameri's equity in another property would almost certainly not have persuaded the senior risk committee to grant the modification request. Contrary to Ameri's conjectural argument, the Chase employee's testimony that Chase was getting out of the construction lending business does not equate with Chase having no intention to service his loan or any other construction loan. The employee's testimony on this point was not further developed and could have meant that Chase had decided not to enter into new construction loan agreements.

Ameri's cause of action for wrongful foreclosure also fails as a matter of law. Despite Ameri's claims of error in the foreclosure process, he has not shown the errors were material or caused them prejudice. In *Debrunner v. Deutsche Bank National Trust Co.* (2012) 204 Cal.App.4th 433, the plaintiff complained the notice of default was defective in part because there was no record of a substitution of trustee. The Court of Appeal held "'a plaintiff in a suit for wrongful foreclosure has generally been required to demonstrate [that] the alleged imperfection in the foreclosure process was prejudicial to the plaintiff's interests.'" (*Id.* at p. 443; *Melendrez v. D & I Investment, Inc.* (2005) 127 Cal.App.4th 1238, 1258 [presumption that nonjudicial foreclosure sale was conducted regularly and fairly may be rebutted only by substantial evidence of "prejudicial procedural irregularity"].) Ameri did not present evidence of prejudice.

Further, notwithstanding the alleged procedural defects, there is no post-sale relief contemplated in the statute. "There is nothing in [Civil Code] section 2923.5 that even

25

hints that noncompliance with the statute would cause any cloud on title after an otherwise properly conducted foreclosure sale. We would merely note that under the plain language of [Civil Code] section 2923.5, read in conjunction with [Civil Code] section 2924g, the *only* remedy provided is a postponement of the sale before it happens." (*Mabry v. Superior Court* (2010) 185 Cal.App.4th 208, 235.)

Another reason the cause of action for wrongful foreclosure fails is that, as a general rule, a plaintiff may not challenge the propriety of a foreclosure on his or her property without offering to repay what he or she borrowed against the property. (*Karlsen v. American Sav. & Loan Assn.* (1971) 15 Cal.App.3d 112, 117.) Ameri did not satisfy the tender rule.

### III. *Forced Abandonment of Unjust Enrichment Cause of Action*

During a pretrial hearing on the parties' motions in limine, the trial court announced it was going to conduct a bench trial on the equitable causes of action in Ameri's third amended complaint before the jury trial began. As a result, Ameri's counsel dismissed his cause of action for unjust enrichment.

Ameri contends the trial court abused its discretion by forcing him to elect to proceed first with his unjust enrichment cause of action as an equitable action. The contention is without merit.

There is no cause of action for unjust enrichment in California. (*McKell v. Washington Mutual, Inc.* (2006) 142 Cal.App.4th 1457, 1490.) "Rather, unjust enrichment is a basis for obtaining restitution based on quasi-contract or imposition of a constructive trust." (*Ibid*.) "The phrase 'Unjust Enrichment' does not describe a theory of

26

recovery, but an effect: the result of a failure to make restitution under circumstances where it is equitable to do so." (*Lauriedale Associates, Ltd. v. Wilson* (1992) 7 Cal.App.4th 1439, 1448.)

"'"In determining whether the action was one triable by a jury at common law, the court is *not bound by the form of the action but rather by the nature of the rights involved* and the facts of the particular case—the gist of the action. A jury trial must be granted where the gist of the action is legal, where the action is in reality cognizable at law."' [Citations.] On the other hand, equitable issues are to be resolved by the court sitting without a jury. [Citations.] 'Where legal and equitable issues are joined in the same action the parties are entitled to a jury trial on the legal issues.' [Citations.] Ordinarily, 'the equitable issues are [to be] tried first and then, if any legal issues remain, a jury may be called.'" (*Arciero Ranches v. Meza*) (1993) 17 Cal.App.4th 114, 123-124.)

Ameri's third amended complaint contained both legal and equitable issues. The trial court did not abuse its discretion by deciding to hear the equitable issues first. Ameri's case authority (*Lectrodryer v. SeoulBank* (2000) 77 Cal.App.4th 723, 726) does not stand for the proposition that a jury can decide equitable issues.[13]

---

[13] Ameri's reliance on *Jolley v. Chase Home Finance, LLC* (2013) 213 Cal.App.4th 872 during oral argument is unavailing. The case is readily distinguishable on a number of points and is not helpful or persuasive as to this case.

DISPOSITION

Judgment is affirmed.

NARES, J.

WE CONCUR:

McCONNELL, P. J.

IRION, J.