Filed 11/16/15  Sharim v. Amin CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| FARHAD SHARIM, et al., | B255414 |
| Plaintiffs and Respondents, | (Los Angeles County |
| v. | Super. Ct. No. LC093219) |
| JOSEPH AMIN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Huey Cotton, Judge.  Affirmed.

Law Offices of Thomas J. Weiss, Thomas J. Weiss and Lindsay K. Seltzer, for Defendant and Appellant.

The Law Offices of Blair Schlecter and Blair L. Schlecter, for Plaintiffs and Respondents.

_____

Farhad Sharim filed a derivative action on behalf of Encino Properties, LLC alleging that defendant Joseph Amin had defrauded Encino and breached his fiduciary duties by structuring a lease of the company's property in a manner that diverted a portion of the company's rental proceeds to himself.  Following a bench trial, the court found in favor of Encino, awarding the company approximately $120,000 in compensatory damages and $500,000 in punitive damages.

On appeal, Amin asserts that: (1) there was insufficient evidence to support an award of punitive damages; (2) there was insufficient evidence to support the court's finding that Encino proved fraudulent concealment; and (3) the court erred in granting a motion to amend the complaint to conform to proof by alleging a claim for fraudulent concealment.  We affirm, concluding that the trial court's decision to award punitive damages was supported by substantial evidence and that Amin has failed to demonstrate prejudice from his other claims of error.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.  Undisputed Background Facts

Farhad Sharim and Joseph Amin were each 50 percent owners of Encino Properties, LLC, which held title to adjoining retail properties located at 18252 and 18254 Sherman Way in Reseda, California.  Amin and Sharim jointly operated a pharmacy at the 18254 Sherman Way location.  With Sharim's consent, Amin spent approximately $400,000 of his own funds to convert the retail space at 18252 Sherman Way into a "fully operating laundromat."

After several years of attempting to run the laundromat business himself, Amin asked real estate agent Robert Melamed to locate a tenant to "lease the space and improvements therein."  In November of 2010, Melamed reached an agreement with Aminda Randhawa to lease the laundromat for a period of 10 years at the rate of $5,000 per month.  Under the agreement, Randhawa was to pay $2,500 per month to lease the premises, which Encino owned, and $2,500 per month to lease the laundromat equipment, which Amin owned.  At Amin's request, however, Randhawa agreed to

2

reallocate his $5,000 monthly payment so that only $1,000 per month would be paid toward the premises and the remaining $4,000 per month would be paid toward the equipment. In January of 2011, Randhawa executed two separate ten-year leases: a $1,000 per month lease of the laundromat premises, which Amin signed on behalf of Encino, and a $4,000 per month lease of the laundromat equipment, which Amin signed on his own behalf.

## B. Summary of the Complaint

On April 5, 2011, Sharim filed an action on behalf of himself and Encino Properties alleging claims for fraud and breach of fiduciary duty arising from the lease agreements Amin had entered into with Randhawa. The fraud claim, which Sharim alleged on behalf of Encino, asserted that Amin had leased Encino's property to Randhawa "without the knowledge or consent of [Sharim], and without authority to do so under the [Encino] Operating Agreement." It further alleged that the $1,000 per month rate set forth in the premises lease was "significantly below the fair market rate for the leasehold space," and that the $4,000 per month rate set forth in the equipment lease was "in excess of [the equipment's] . . . lease value." According to the complaint, by structuring the leases in such a manner, Amin had intended to "divert funds to himself" that were "rightfully due to [Encino]." The breach of fiduciary duty claim, which Sharim alleged on behalf of himself and Encino, was predicated on the same conduct. Both claims included a request for punitive damages, asserting that Amin had acted "with the intent to . . . injure Encino . . ., such as to constitute oppression, fraud or malice."

The complaint also included a claim for declaratory relief asserting that "an actual controversy existed between [Encino] and [Amin] . . . concerning their respective rights, in that [Encino] contends that [Amin] did not have the right and authority to enter into the subject lease on behalf of [Encino], and [Amin] . . . claim[s] that [he] had the right and

3

authority" to do so.  The complaint requested a "judicial determination" on the issue "in order that [Encino] . . . may ascertain the validity of the lease."[1]

### C. Evidence at Trial

At the ensuing bench trial, Robert Melamed testified that Amin had asked him to find a party interested in buying or leasing the laundromat.  Pursuant to this request, Melamed negotiated a lease with Randhawa requiring him to pay $2,500 per month for the laundromat premises and $2,500 per month for the laundromat equipment.  Melamed believed a monthly rental rate of $2,500 reflected "a fair price" for the laundromat premises.

Melamed further testified that, at some point after Randhawa had agreed to the lease terms described above, Amin instructed Melamed to reallocate the lease payments so that Randhawa would only pay $1,000 per month toward the premises, and the remaining $4,000 per month toward the equipment.  According to Melamed, Randhawa had agreed to the proposed reallocation because the total lease amount remained at $5,000 per month.  Melamed stated that although he had complied with Amin's request to restructure the leases, he believed that a rental rate of $1,000 per month for the premises was "less than fair market" and "was not a good and fair lease to Encino Properties."

When Melamed drafted the premises and equipment lease agreements, he named Amin as the lessor on both leases.  At Amin's request, however, Melamed changed the lessor on the premises lease to Encino Properties; Amin then signed the document on Encino's behalf.  Melamed testified that he never discussed the lease transactions with Sharim, and that Amin had never advised him to obtain Sharim's consent prior to

---

[1]     The complaint alleged additional claims that are not at issue in this appeal, including: (1) a negligence claim alleging that Robert Melamed had breached his professional duties to Encino by advising the company to "enter into a lease . . . at an amount that was more than fifty percent less than the prevailing market rate"; (2) a rescission claim against Randhawa alleging that the premises lease should be invalidated because Randhawa knew "the lease was for considerably less than fair rental value"; and (3) a trespass claim against Amin.  Prior to trial, Encino dismissed its claims against Randhawa and Melamed, who are not parties to this appeal.

finalizing the leases. Melamed received a $15,000 commission for the lease agreements, $5,500 of which was allocated to the premises lease.

Amin provided conflicting testimony, asserting that he had only requested that the premises lease be lowered to $1,000 per month because Melamed had told him that was the fair market value of the property. Amin also denied having ever asked Melamed to find a lessee for the property, and denied that Melamed had acted as his agent when negotiating the premises lease. Amin admitted he had signed the premises lease on behalf of Encino Properties, and that he had done so without consulting Sharim.

Randhawa testified that he had agreed to reallocate the lease amounts to $1,000 and $4,000 because he was only concerned about his total monthly payment. Randhawa also testified that, prior to signing the lease agreements, he had never met Sharim. After the leases were executed, however, Sharim came to the laundromat and told Randhawa he had no right to be there. When Sharim attempted to block Randhawa from entering the premises, Randhawa told Sharim he had a lease and called the police.

Sharim testified that he was not aware of the premises lease until after it had been executed. Sharim stated that, upon learning of the lease, he had tried to stop Randhawa from occupying the premises because he believed the lease had been illegally procured. He also admitted that he had sent Amin's attorney a letter stating that Randhawa had provided him a copy of the signed lease and that he believed the lease was an "illegal act."

Tupper Leinke, an expert witness on real estate appraisal, testified that his analysis of comparable properties in the area indicated that the fair market rental value of the laundromat premises was at least $2,500 per month.[2]

---

[2] During trial, Amin also presented evidence that Encino had previously agreed to lease him the laundromat premises in exchange for $2,000 per month in advertising for the adjoining pharmacy. Amin asserted that the premises lease he had entered into with Randhawa for $1,000 per month was intended as a sublease, and that Encino was therefore effectively receiving $3,000 per month in value for the laundromat premises: $1,000 in rent from Randhawa and $2,000 in advertising from Amin. The trial court, however, found that while there was evidence Amin had previously leased the

5

### D. The Court's Proposed Statement of Decision

Following trial, the court issued a proposed statement of decision concluding that the terms of the "Encino Properties Operating Agreement" did authorize Amin to lease the laundromat premises without obtaining Sharim's consent, and that Sharim had "acceded to Amin's desire to control the leasing of the [laundromat] space." The court concluded that, in light of these findings, the 10-year premises lease Amin had entered into with Randhawa was enforceable against Encino.

The court also found that while Amin had initially agreed to lease the premises to Randhawa at a rate of $2,500 per month, Amin later "insisted that that the [premises] lease rent be reduced from $2,500 to $1,000," and that the "$1,500 reduction in lease rental amount be allocated to [the] separate . . . equipment lease, thereby increasing the sum to be paid to Amin individually from $2,500 to $4,000 per month." The court emphasized that there was no evidence Randhawa had ever requested "this change in payment allocation."

The court further concluded that the evidence showed the fair market rental value of the laundromat premises was "a minimum of $2,500" per month, and that the fair market rental value of the laundromat equipment was also $2,500 per month. Based on the testimony that Sharim's witnesses had provided regarding current and future rental value of the laundromat premises, the court found that Amin's conduct had deprived Encino of $214,000. A settlement with another party, in the amount of $45,000, reduced Encino's loss to $169,000.

_____

laundromat premises from Encino, Amin's decision to lease the premises to Randhawa had "vitiated" that prior lease. Amin has not challenged that finding on appeal. Accordingly, for the purposes of this appeal, we accept the court's finding that Amin's lease with Randhawa was the only operative lease of the laundromat premises.

6

The court's statement of decision also analyzed each of the causes of action Sharim and Encino had presented at trial, which included fraud, breach of fiduciary duty and declaratory relief.[3] On the fraud claim, the court found Encino had proven each of the elements necessary to establish "fraudulent concealment." Specifically, the court found Encino had showed "by a preponderance of the evidence" that: (1) Amin "intentionally and in bad faith failed to disclose" that Randhawa was originally willing to pay $2,500 to lease Encino's premises, and that Amin had subsequently requested Randhawa to restructure the lease in a manner that "divert[ed] [a portion] of the [premises lease proceeds] to himself"; (2) Encino was not aware of these facts at any time prior to the execution of the lease agreements; (3) Amin had "intended in bad faith to deceive [Encino] by concealing this information"; (4) Encino "reasonably relied on Amin's deception"; and (5) Encino was harmed by having been "deprived of the difference between the fair market rent of $2,500 per month and the actual monthly rent charged to Randhawa of $1,000/month."

The court also found Encino had proven each of the elements necessary to establish its claim that Amin had breached fiduciary duties he owed to the company based on his status as a "managing member." Specifically, the court found that: (1) Amin was a managing member of Encino; (2) Amin "acted for the purpose of securing a fair market rental rate for the subject property, though [he] ultimately acted against this purpose"; (3) "[n]o reasonably careful managing member of [Encino] would act to reject the $2,500 per month rental rate agreed to by Randhawa in favor of a lesser rental rate of $1,000 per month"; (4) Sharim, the only other managing member of Encino, "did not give informed consent to the terms set forth in the [premises] lease"; and (5) Encino was harmed by Amin's conduct "in at least the amount of the difference between the agreed rental rate of $2,500 per month and the actual rate of $1,000." The court additionally noted that "[t]he fact . . . Amin . . . diverted this $1,500 per month difference to his own benefit . . . evidence[d] the bad faith nature of Amin's conduct."

---

[3]     The court also addressed a trespass claim that Encino had alleged against Sharim. That claim, which the court denied, is not at issue in this appeal.

The court also found that Sharim had proven "an individual claim against Amin for breach of fiduciary duty of loyalty." However, the court awarded Sharim only "nominal damages of $2500 on his individual claim."

On the declaratory relief claim, the court explained that because it had found Amin was authorized to lease Encino's premises, "the Randhawa lease was binding upon [Encino]." The court added, however, that Amin did not have "authority to defraud [Encino] by leasing the property at a below fair market rental rate. For this deficiency, Amin is personally liable."

Finally, the court's proposed statement explained that "the prayer for punitive or exemplary damages based upon the [fraud and fiduciary duty claims] was bifurcated at Amin's request."

### E. Amin's Objections to the Proposed Statement of Decision and the Court's Final Statement of Decision

Amin filed a response to the proposed statement of decision raising several objections. First, Amin argued that while the court's statement had concluded Encino proved a claim for "fraudulent concealment," the fraud claim set forth in the complaint did not allege any concealment had occurred; instead, the pleading asserted only that "Amin's acts were without Sharim's 'knowledge or consent.'" Thus, according to Amin, the court had no basis to proceed under a theory of fraudulent concealment. Amin also argued the evidence at trial was not sufficient to prove he had concealed the lease terms from Encino because the undisputed evidence showed he was acting on behalf of the company when he entered the lease. Amin further asserted that no other form of fraud had been proven.

Amin also challenged the manner in which the court had calculated compensatory damages, asserting that Sharim's own experts had concluded that the total damages to Encino were only $120,000, not $165,000. Amin argued there was also no basis to award Sharim $2,500 on his individual claim of breach of fiduciary duty because the court had

8

failed to "identify any damages personal to Sharim as distinguished from damages to Encino by reason of the land rent shortage."

Finally, Amin argued that while the court's statement of decision indicated there would be a separate hearing to determine the amount of any punitive damages award, no such hearing was necessary because "the statutory standard of proof [for punitive damages had not been] met." Amin explained that, under Civil Code section 3294, the decision to impose punitive damages had to be assessed under the "clear and convincing" standard of proof. The court's proposed statement of decision, however, had concluded that Encino established fraud only by "a preponderance of the evidence."

At the hearing on Amin's objections, Shamir conceded that Encino's compensatory damages should be lowered to $120,042, and that the "nominal damages" on his individual claim for breach of fiduciary duty should be reduced to one dollar. On the issue of punitive damages, Shamir argued that while the court was not required to articulate the applicable standard of proof in its statement of decision, the court should nonetheless clarify that its fraud findings were made under the clear and convincing standard "as a cautionary measure." Finally, Shamir argued that his complaint had specifically pled a fraud claim, thereby supporting the court's decision to address the issue of fraudulent concealment. However, to remedy any potential procedural defect, Shamir made an oral motion "to amend the complaint to conform to proof to allege that [Amin] concealed the fact that he could have received $2,500 per month on behalf the company and instead took $1,000 per month which personally benefited himself."

The court informed the parties it would allow Amin to submit a brief opposing Shamir's motion to amend his pleading to conform to the proof at trial. On the question of punitive damages, the court explained that it would have found Amin's conduct amounted to fraud "regardless of the standard," adding that "[i]t could have been beyond a reasonable doubt and it still would be a burden that was met." The court agreed, however, "that the standard should be clear and convincing."

After Amin submitted his briefing on Shamir's motion to amend, the court issued a final statement of decision that was substantially identical to its original proposed

statement. The final statement did, however, contain three material changes. First, in the final statement's analysis of Encino's fraudulent concealment claim, the court included language indicating that it had permitted Encino to "amend[] the pleading to conform to proof," and that Amin was not prejudiced by the amendment because the complaint's fraud claim referenced deceptive conduct that essentially involved the concealment of material information. Second, the court inserted language clarifying that Encino had proven each element of "fraudulent concealment" by "clear and convincing evidence." Third, the court reduced Encino's compensatory damages to $120,042, and Sharim's "nominal damages" on his individual claim for breach of fiduciary duty to one dollar. In all other respects, the final statement of decision was identical to the court's proposed statement.

### F. *Punitive Damages and Entry of Judgment*

After entering its final statement of decision on the liability phase of the proceedings, the court held a hearing on punitive damages. The only evidence the parties presented at the hearing related to Amin's net worth. Amin's counsel argued his client had a negative net worth, and that a nominal punitive damages award would therefore be sufficient to punish him. Sharim's counsel, however, argued that Amin had grossly underestimated his true net worth, and requested that Encino be awarded $800,000 in punitive damages. Counsel clarified that, in making its award determination, the court should consider that Amin owned 50 percent of Encino and would therefore effectively receive half of any punitive damages award he might be required to pay. The court thereafter issued a proposed statement of decision finding Amin's net worth to be between $3,100,000 and $4,250,000, and awarding Encino $500,000 in punitive damages.

Amin filed objections to the proposed statement and requested that the court explain the basis for several of the factual findings it had made regarding Amin's net worth. The court thereafter issued a modified statement of decision responding to Amin's objections and reaffirming its punitive damages award of $500,000. The court

10

entered a judgment requiring Amin to pay Encino $654,000, which included compensatory damages, punitive damages and costs.

## DISCUSSION

Amin raises three issues on appeal. First, he asserts there was insufficient evidence to support the trial court's decision to impose punitive damages. Second, he contends there was insufficient evidence to support a finding that he engaged in fraudulent concealment. Third, he argues the trial court abused its discretion in granting Encino's post trial motion to amend the pleading to add a claim for fraudulent concealment.

### A. *Substantial Evidence Supports the Trial Court's Decision to Impose Punitive Damages*

Amin argues there was insufficient evidence to support the court's decision to impose punitive damages. Amin does not challenge the amount of the punitive damages award or any of the factual findings the court made regarding his net worth. Instead, Amin contends only that there was insufficient evidence for the court to conclude he had engaged in any conduct that justified the imposition of punitive damages.

Civil Code section 3294, subdivision (a) states: "In an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant." Thus, to obtain punitive damages under section 3294, the plaintiff must prove both that the defendant breached a noncontractual legal obligation, and that he did so with "malice, oppression or fraud." Amin has not appealed the court's finding that he breached his fiduciary duties to Encino, nor does he dispute that such duties were "noncontractual legal obligations." Accordingly, we need only determine

11

whether there was sufficient evidence to support the court's determination that Amin acted with "malice, fraud or oppression."**4**

We review the court's decision to impose punitive damages under the substantial evidence standard of review. (*Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 891.) "As in other cases involving the issue of substantial evidence, we are bound to 'consider the evidence in the light most favorable to the prevailing party, giving him the benefit of every reasonable inference, and resolving conflicts in support of the judgment.' [Citation.]" (*Ibid.*)**5** If the trial court

---

**4** In his appellate brief, Amin contends we cannot consider the breach of fiduciary duty as a "basis for [the] punitive damages . . . . [because] the trial court did not premise its finding of liability for punitive damages on the breach of fiduciary duty claim, but on the fraud claim." The record does not, however, support Amin's assertion that the court's punitive damages award was based solely on the fraud claim. The trial court's statement of decision on the issue of liability acknowledged that Sharim had sought "punitive or exemplary damages based upon the [fraud] and [breach of fiduciary duty] causes of action," and stated that the amount of any such damages would be determined at a bifurcated hearing. Moreover, in its analysis of Encino's claim for breach of fiduciary duty, the court specifically found Amin had acted "in bad faith." The statement of decision on punitive damages does not distinguish between the fraud and breach of fiduciary claims, stating only that the court was "awarding punitive damages on the derivative action in the amount of $500,000." Thus, nothing in the court's rulings suggests it only intended to award punitive damages in relation to the fraudulent concealment claim; instead, the language of its statement of decision indicate it found punitive damages were appropriate in relation to both claims.

**5** Although the heightened "clear and convincing evidence" standard of proof applied to the trial court's findings on punitive damages (see Civil Code, § 3294), that does not affect our standard of review on appeal in determining whether there is substantial evidence to support the court's findings. As explained by our Supreme Court: "[The clear and convincing evidence] standard was adopted . . . for the edification and guidance of the trial court, and was not intended as a standard for appellate review. 'The sufficiency of evidence to establish a given fact, where the law requires proof of the fact to be clear and convincing, is primarily a question for the [trier of fact] to determine, and if there is substantial evidence to support its conclusion, the determination is not open to review on appeal.' [Citations.]" (*Crail v. Blakely* (1973) 8 Cal.3d 744, 750 [fn. omitted].) "Thus, on appeal from a judgment required to be based upon clear and convincing evidence, 'the clear and convincing test disappears . . . [and] the usual rule of conflicting evidence is applied, giving full effect to the respondent's evidence, however

12

findings are supported by substantial evidence, we must affirm the punitive damages award even where the evidence may also be reconciled with contrary findings. (See *Lenk v. Total-Western, Inc*. (2001) 89 Cal.App.4th 959, 968.)

In this case, the court concluded punitive damages were appropriate because the evidence at trial showed Amin had engaged in fraudulent conduct. Section 3294, subdivision (c)(3) defines the term fraud to mean: "an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury." Accordingly, to establish fraud under section 3294, Amin had to demonstrate two elements: (1) Amin intentionally concealed a material fact known to him; and (2) he did so with the intent of depriving Encino of property.

The court found Amin had "intentionally and in bad faith failed to disclose" that Randhawa had originally offered to lease Encino's premises for $2,500 per month, and that Amin thereafter requested to restructure the lease agreements so that only $1,000 per month would be paid toward the premises and $4,000 per month would be paid toward the equipment, thereby diverting $1,500 per month from Encino to Amin. The record contains substantial evidence from which the court could reasonably infer that Amin intentionally withheld this information from Encino. Amin admitted at trial that he did not consult with Sharim, Encino's only other managing member, before signing the premises lease on Encino's behalf. Amin confirms these statements in his appellate brief, acknowledging that he was "solely" responsible for negotiating the leases with Randhawa and that he did so "with no participation by Sharim." Sharim likewise testified he was not aware of the terms set forth in the leases, or the negotiations that had preceded their execution, until after the leases were signed. In light of these statements from the two

---

slight, and disregarding the appellant's evidence, however strong.' [Citation.]" (*Sheila v. Superior Court* (2000) 84 Cal.App.4th 872, 881.)

principals involved in this lawsuit, the court could reasonably infer Amin intentionally concealed his conduct regarding the lease transactions from Sharim and Encino.[6]

The court also found by clear and convincing evidence that, by engaging in such concealment, Amin had "intended in bad faith" to deprive Encino of $1,500 in monthly rental payments. Again, the record contains substantial evidence from which the court could reasonably infer such a finding. The undisputed evidence at trial showed Randhawa initially offered to pay $2,500 per month to lease Encino's premises and $2,500 to lease Amin's equipment. Melamed, however, testified that Amin asked him to change the allocation to $1,000 and $4,000 respectively, and that Randhawa agreed to this request. Melamed and an expert witness testified that $2,500 per month reflected the fair market rental value of the premises, while $1,000 per month fell below the fair market rental value. The court could reasonably infer from this evidence that Amin intended to deprive Encino of property by unilaterally proposing to change the lease allocations in a manner that reduced the company's monthly rental payment by $1,500 per month, while increasing the monthly payment Amin received for his equipment by that same amount.

Amin, however, contends that Sharim failed to prove several elements necessary to establish his conduct amounted to fraud. First, he argues no reasonable trier of fact could conclude he "concealed" any information regarding the lease transactions from Encino because he was a 50 percent owner and manager of the company. According to Amin, his status as an owner and manager of the company shows that "both [he] and the Company knew all the facts [he] allegedly 'failed to disclose' to the Company." Thus, Amin appears to assert that any knowledge he had regarding the lease was necessarily imputed to the Encino based on his status as an officer of the company.

---

[6]     Amin does not dispute the information he was found to have concealed—that Randhawa initially offered to lease the premises for $2,500 per month and that Amin requested the lease payments be reallocated in a manner that benefitted him at the expense of the company—qualified as a "material" fact within the meaning of section 3294.

14

As a general matter, however, "[a] corporation is not chargeable with the knowledge of an officer who collaborates with outsiders to defraud the corporation." (*Peregrine Funding Inc. v. Sheppard Mullin Richeter & Hampton LLP* (2005) 133 Cal.App.4th 658, 679; *Meyer v. Glenmoor Homes* Inc. (1966) 246 Cal.App.2d 242, 264; *S.E.C. v. Seaboard Corp.* (9th Cir. 1982) 677 F.2d 1301, 1310 ["[corporate officer's] knowledge . . . cannot be imputed to [the corporation when the officer] was alleged to be a participant in the fraud against it"].)  That is essentially what the court found to have happened here, concluding that Amin induced Randhawa to restructure the laundromat lease agreements in a manner that deprived the company of $1,500 per month in rental payments while enriching Amin in the same amount.  Under the circumstances of this case, we find no legal basis to conclude that Amin's knowledge of his own fraudulent misconduct may be properly imputed to the company against which he perpetrated the fraud.[7]

Amin also asserts there was insufficient evidence to support a finding of fraud within the meaning of section 3294 because Sharim presented no evidence that Encino "rel[ied] on any concealment to its detriment."  When fraud is alleged to have occurred as the result of a concealment, rather than a misrepresentation, reliance is established when there is a "reasonable probability" (*Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1239 (*Alliance Mortgage*)) the plaintiff  would have "behaved differently" if the "omitted information had been disclosed."  (*Mirkin v. Wasserman* (1993) 5 Cal.4th 1082, 1093.)  Amin theorizes that, in this case, a reasonable trier of fact could not conclude Encino would have acted any differently had it known of the concealed lease terms

---

[7]     Amin also contends the court erred in finding that Encino was unaware of the lease terms because there was evidence at trial that Sharim tried to obstruct enforcement of the lease.  In support, Amin cites evidence related to conduct that Sharim engaged in after he learned of the executed leases.  Based on the trial court's findings, however, Amin's fraud was completed when he and Randhawa executed the lease documents, at which point the premises lease became binding on Encino.  Sharim's subsequent conduct merely shows that, after learning of Amin's fraudulent conduct, he attempted to preclude enforcement of the agreement.  It does not show he was aware of the lease negotiations or the lease terms at any point prior to the completion of the fraud.

15

because the evidence at trial demonstrated that Sharim objected to the lease and attempted to "obstruct" its enforcement. Although Amin does not cite any evidence in support of this argument, he appears to rely on testimony showing that, after learning of the executed lease, Sharim told Amin's counsel he did not believe the lease was enforceable, and then tried to prohibit Randhawa from occupying the premises.

We fail to see how such evidence precluded the court from finding that Encino would have acted differently had Amin disclosed the terms of the lease before the agreement was executed. Based on the evidence at trial, the court could reasonably infer that if Amin had disclosed that he intended to restructure the lease in a manner that deprived Encino of $1,500 per month in rent, Sharim would have taken legal action to enjoin such conduct before the premises lease became binding on the company. As Amin himself acknowledges, the evidence at trial showed Sharim took steps to invalidate the lease immediately after he learned of its existence, and then commenced this action "very shortly after the lease was entered into." The fact that Sharim took legal action immediately after learning of the lease agreement supports the court's findings that, had Amin notified him of the proposed terms before executing the agreement, Sharim would have attempted to prohibit him from signing the lease on Encino's behalf. While it is possible Sharim might not have elected to take such action, the court's factual finding on this issue was a reasonable and permissible conclusion. (See *Alliance Mortgage, supra*, 10 Cal.4th at p. 1239 ["'Except in the rare case where the undisputed facts leave no room for a reasonable difference of opinion, the question of . . . reliance . . . is a question of fact'"]; *cf. Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 977 ["a presumption, or at least an inference, of reliance arises wherever there is a showing that a misrepresentation was material"].)

Finally, Amin contends the evidence failed to establish his conduct amounted to fraud because Sharim did not demonstrate that the concealment of the lease transactions caused the company harm. According to Amin, "[a]ny harm to the Company was the result of the lower than market rental charged for the land, not any concealment of any fact relating to the lease." Amin's contention that his concealment of the lease terms

16

played no possible role in bringing about Encino's injury is without merit. As explained above, the court could reasonably conclude that had Amin disclosed the terms of the lease before it was executed, Sharim could have taken legal action on behalf of the company to preclude the document from being executed, thereby avoiding the very damages the company incurred.

In sum, the record contains substantial evidence that Amin's conduct amounted to fraud within the meaning of section 3294, thereby supporting the court's award of punitive damages.

### B. The Trial Court's Alleged Errors Pertaining to the Fraudulent Concealment Claim Were Harmless

Amin raises additional arguments asserting that: (1) the trial court erred in permitting Sharim to amend his complaint to conform to proof by adding a claim for fraudulent concealment; and (2) there was insufficient evidence to support the court's finding on Encino's fraudulent concealment claim. We need not reach the merits of either argument, as Amin has failed to demonstrate he suffered any prejudice as the result of either alleged error. (*Winfred D. v. Michelin North American Inc.* (2008) 165 Cal.App.4th 1011, 1038 ["""Prejudice is not presumed and the burden is on the appellant to show its existence'"" [citations.]"]; *Brokopp v. Ford Motor Company* (1977) 71 Cal.App.3d 841, 853-854 ["'Prejudice from error is never presumed but must be affirmatively demonstrated by the appellant'"].)

To establish prejudice, Amin was required to show """"it is reasonably probable a result more favorable to [him] would have been reached absent the error. [Citations.]' [Citation.]" [Citations.]' [Citation.]" (*Villano v. Waterman Convalescent Hospital, Inc.* (2010) 181 Cal.App.4th 1189, 1200.) For the reasons explained below, even if we were to find that the court erred by allowing the claim for fraudulent conduct or entering a ruling on the fraud claim, that would have no effect on the judgment.

At trial, Sharim asserted derivative claims asserting that Amin had committed fraud (later amended to fraudulent concealment) and breached his fiduciary duties by

17

restructuring the lease agreement in a manner that enriched himself at the expense of the company.  Amin does not dispute that the court found that his fraudulent concealment and his breach of fiduciary duties resulted in the same form of compensatory damages to Encino:  the difference between the fair market rental rate of the premises ($2,500 per month) and the actual rate at which Amin leased the premises ($1,000 per month), which was determined to be a total of $120,042 over the ten-year lease period.  Amin has not challenged the court's finding on Encino's breach of fiduciary duty claim.  Accordingly, even if were to find the court erred in allowing Sharim to assert a fraudulent concealment claim and finding that the claim had been proven, Amin would still be required to pay the same compensatory damages as a result of the breach of fiduciary duty claim.

The same analysis is applicable to the punitive damages award.  Encino specifically requested punitive damages on both the fraud claim and the breach of fiduciary duty claim.  As explained above, the record contains sufficient evidence to support the court's finding that Amin's breach of his fiduciary duties to Encino was conducted in a manner that constituted "fraud" within the meaning of Civil Code section 3294.  Thus, even in the absence of the fraud claim, Amin would still be liable for punitive damages.

## DISPOSITION

The judgment is affirmed.  Respondent shall recover its costs on appeal.


ZELON, J.

We concur:


PERLUSS, P. J.


SEGAL, J.

18